### THE TOWN OF LONDONDERRY *vs.* THE TOWN OF CHESTER.

Marriage is in this state only a civil contract ; and the object of having it solemnized before some officer, is to give it publicity, and to preserve a record of the contract.

If this contract be made between adults, *per verba de presenti,* and without fraud or force, no solemnization whatever is, upon general principles, necessary to its validity.

But our statute and the usuages of most civilized nations seem to require a solemnization of some form before witnesses ; yet our statute does not declare the contract void, if not solemnized before a magistrate or a minister.

Where an acting magistrate or minister solemnize a marriage, but under such circumstances as expose them to a penalty, the marriage is still valid as to the parties joined and the public.

A person, who has once been set apart as a public teacher of religion according to the forms of the sect to which he belongs, is an "ordained minister ;" and whether settled over any society or not, seems qualified to solemnize marriage in the county, where he has his "permanent residence."

THIS was assumpsit for support, furnished to *Sally Aiken,* who was alleged to be the wife of *Samuel Aiken.*

The cause was tried here, September term, A. D. 1819 ; and the only question saved was in respect to the marriage between the pauper and *Samuel Aiken,* who was admitted to have a legal settlement in Chester.

The evidence upon that point was, that, in May, A. D. 1814, at Londonderry, one *Jonathan Brown* performed the ceremony of marriage between the pauper and the said

Londonderry
*vs.*
Chester.

*Samuel*, and that they had since cohabited together as husband and wife. It further appeared, that about twenty years since *Brown* was duly ordained as a clergyman in the presbyterian form, and was soon after settled over the first parish in Londonderry. In A. D. 1804, he fell under censure, and was dismissed by the parish, and was, by the presbytery, " enjoined to desist " from preaching. In A. D. 1805, the injunction was removed ; and he has since continued to reside there and perform clerical duties in that and the adjoining towns, but has not again been settled over any particular society or town.

The court admitted this testimony as competent to prove a legal marriage ; and a verdict having been found for the plaintiffs on the other points in the cause, it was continued for further advisement upon the before mentioned question.

*Thom* and *Porter*, counsel for the plaintiffs.

*Kent, French* and *Mason*, for the defendants.

WOODBURY, J., pronounced the judgment of the court.

Our statute of February, 1791, is the only existing act of the legislature of this state " regulating marriages."(1) The question which arises in this case must, therefore, be settled by a construction of that statute ; and, where the statute is deficient, by such general principles of law and reason as are applicable to the nature of the contract of marriage.

(1) 1 N. H. Laws 350.

The 1st section of this statute provides, " that every or- " dained minister of the gospel in the county where he is set- " tled, or hath his permanent residence, and in no other " place ; and every justice of the peace, in the county for " which he is commissioned, and in no other place whatso- " ever, shall be, and hereby are authorized and empower- " ed to solemnize marriages between persons, who may law- " fully enter into that relation."

The 2d section provides, that the intention of marriage shall be published in a certain manner, and a certificate of the fact produced to the justice or minister, who shall be desired to marry the parties.

The 3d section provides, " that if any justice of the " peace or minister shall join any persons in marriage with- " out a certificate as aforesaid, or shall *otherwise* than is ex- " pressly allowed by this act, join any persons in mar- " riage, they shall severally forfeit and pay the sum of " £20," &c.

" And if any person, not authorized and empowered to " solemnize marriages by this act, shall join any persons " in marriage, whether with or or without publishment, and " be convicted thereof," &c. they shall pay a fine "not to " exceed £100, nor be less than £30."

The remaining sections provide, that marriages may continue to be solemnized by quakers as formerly, without incurring any penalty; and that every year a return of all marriages celebrated by quakers, and by ministers or justices, shall be made to the town clerk, and by him be recorded; and imposes a penalty for neglect upon each of those who offend. None of the sections prescribe any form of solemnization; and none declare, that a contract of marriage, without any solemnization shall be void; or that it shall be void, if solemnized in an irregular manner, or by a person not duly qualified.

The first inquiry relates to the qualifications of Mr. *Brown* to solemnize marriages. Was he " an ordained minister " of the gospel ?" It is admitted, that he was once duly " ordained" according to the forms used by presbyterians. The language of some statutes is to be construed with a reference to the peculiar sentiments of those who made them; that of other statutes with a reference to the definitions given in English law books; and that of other statutes with reference to its popular signification, and the public opera- tion of any particular construction.

It is probable, that a majority of our legislators in A. D. 1791, were congregationalists; and if, by " ordained," they meant ordination only in conformity to the Cambridge platform of A. D. 1649, it ought to have been " by the " laying on of the hands of the elders," or " in such church- " es where there are no elders," " by some of the brethren

"orderly chosen by the church thereunto." *Mather's Magnalia, b. 5, ch. 9.—2 Hutchinson's Hist.* 474, 382.

But such a strict acceptation of the term might subject to penalties even some clergy, who now call themselves congregationalists. If we resort to the English law books, the only ordination there spoken of as valid for the purpose of solemnizing marriage, is an ordination according to the forms of the episcopal church ; and the candidate must be in *sacris ordinibus constitum* by those only, who claim a peculiar power to ordain by descent, in an unbroken line, from the apostolic age. 1 *Salk.* 119, *Haydon vs. Gould.*—*Com. Di.* " *Baron & Feme.*"—*Common Prayer Book,* " *Ordination.*" —1 *Belk. Hist.* 210.

Under this view of the word, penalties would be equally numerous and the operation of the statute be no less partial and invidious.

According to our constitution, " every denomination of " christians, demeaning themselves quietly, and as good " subjects of the state shall be equally under the protection " of the law.(1) And we are satisfied, that, by the spirit of our institutions, those, who are ordained in conformity to the customs of any such " denomination," are duly " ordained"* within the meaning of this statute.

But at the time Mr. *Brown* solemnized this marriage, he had been dismissed from the society over which he was first ordained ; and had not been re-settled over any other society. Hence it is contended, that his first ordination had become invalid ; and that till again " ordained" and settled over some society he was altogether unqualified to solemnize marriage.

This argument certainly accords with the doctrines once held by congregationalists. Because, at first, they considered " ordination" to be the mere induction of a person into the office of minister over a certain church ; and after the termination of this pastoral relation, that the virtue or effect of the ordination ceased also. *Mather's Mag.* 49, *b.* 5, *ch.*

Londonderry
*vs.*
Chester.

(1) 1 N. H. Laws 2.

---

* 16 Mass. Rep. 512.

Londonderry
*vs.*
Chester.

6 & 9.—*Rees' Cyclopedia,* " *Ordination.*"—2 *Hist. Coll.* (*new series*) 129.—1 *Prince's Annals,* 92, 189, 191.

But early as A. D. 1679, the congregationalists themselves found it expedient to hold only to the "substance" of their platform; and " the neighboring ministers at Cambridge" then passed a vote, that one of their persuasion once duly elected and " ordained" as a minister in " any evangelical churches" " should be acknowledged in all of them as " an *ordained* minister of our Lord Jesus Christ" ; and in pursuance of this relaxation it soon became the practice, that an " ordained minister," though dismissed from his parish, might be elected over another and " enjoyed to all evangel-"ical purposes without being *re-ordained* at all." *Mather's Mag. b.* 5, *p.* 39, 40, 43.

At length it was held, that the force and effect of the first ordination always continued after the pastoral relation was dissolved ; and the minister, when re-settled, might or might not be re-ordained according to the option or prejudices of those concerned.

By the articles of union between this sect and the presbyterians, the latter were left to their own notions concerning " ordinations."(1) And we do not find, that the presbyterians ever held, that a minister, after a removal from his parish, ceased to be ordained, and when re-settled must be re-ordained. The episcopal church never re-ordain,(2) and among Roman catholics, from whom most of these ceremonies originated, re-ordination is, by the council of Trent,(3) pronounced a sacrilege.

(1) Math.
Mag. b. 5.

(2) 2 Hooker's
Eccles. Polity
469.

(3) Sess. 7,
Can. 9.

Indeed, the modern practice of most sects to " ordain " missionaries to preach at large, and to invest them with all sacerdotal power, though never settled over any society, is an evidence of public opinion and public usage on this point, which would render very oppressive a construction of the statute, that every person incurred a penalty, as not being duly " ordained," who solemnized a marriage at a time, when he was not actually settled over some society.

The argument however, is pressed farther ; and, though Mr. *Brown* may have been duly " ordained," it is contended,

that, unless settled over some society when he solemnized this marriage, he cannot be deemed a " minister" within the true meaning of the statute.

The primitive ages of New-England, and the doctrines of the " Independents" or Brownists, from whom many of our ancestors sprung, furnish some support to this argument.—— The independents undoubtedly held, that the business of a minister was an office rather than a profession. That when a person was elected as a public teacher to any society he then first became a " minister" and that when the time of his service expired or he was dismissed, he ceased to be a " minister" till re-appointed over that, or some other society. A notion similar to this prevailed as early as the reign of Queen Elizabeth, and was got up in hostility to the non-resident clergy. (2 *Hooker Eccles. Pol.* 466 *p. b.* 5.) *Robinson*, the most distinguished leader of our puritans while alroad, advised them " to abandon, avoid, and shake off the name of Brownist," and they professed to do it. *Wise's Vindication, ch.* 6.—*Mather's Mag. b.* 5, *ch.* 2, *and b.* 1, *ch.* 3.—1 *Belk. Hist. N. H.* 70.

Yet it is certain, that for many years they retained the doctrines of the independents or Brownists on the subject of ministers.(1) And between the removal and new settlement of a public teacher of religion, he was considered void of all sacerdotal power, and degenerated into a mere layman. In fine, he was not in office ; and consequently could perform none of the duties of what was deemed the office of a " minister."

(1) 1 Hutch. Hist. 368, 381.

This strictness, however, was in time forced to yield to circumstances of convenience ; and ministers of neighboring societies, and even those dismissed from their former societies, were permitted, occasionally, to preach and administer ordinances to other societies, without any express election or choice. But even now such persons can hardly be deemed the ministers of the people where they officiate, except it be by their implied consent *pro tempore ;* and it would not now be tolerated in any part of New-England, that any

man should be deemed a minister to any society, unless free-
ly elected by them to that station.

The true doctrine probably is, that the particular study
and preaching of divinity is a profession, like the study and
practice of law or physic ; that those ordained in that pro-
fession are ministers, as those are attorneys or physicians,
who have been admitted by proper authority to act as such;
but that they are not ministers in respect to any particular
society or individual, as the others are not their attorneys
or physicians, unless employed by them.

It is manifest, however, that they are *qualified* to be em-
ployed, and that is the point in controversy. There is, to
be sure, some intrinsic difficulty in determining, when a
person ceases to be a member of any particular profession.
But in these days, it would hardly answer to hold, that
whenever he ceases to have constant employment in his
profession, he ceases to be a member of it. Mr. *Brown*, in
the present case, occasionally performed ministerial duties,
and was doubtless ready to perform them statedly had he
been requested. He had never been actually disfranchised
by the rules of the profession to which he belonged ; and
consequently was no more obnoxious to the penalties of this
statute than hundreds of unsettled clergy, who solemnize
marriages in various sections of the state.

None can appreciate more highly than we do the unspeak-
able blessing of an intelligent and settled ministry. Some
of the most important duties of divines must also be neglect-
ed by an itinerant life, incompatible with either study or
the interchange of parochial sympathies. But the gospel
ought to be preached to all ; some quarters of our country
are too thinly settled for the permanent maintenance of re-
ligious instructors, and some sects doubt the expediency of
having their clergy settled over particular societies.

From such general considerations, therefore, we do not
feel warranted in holding, that the rights and privileges of
an " ordained minister" continue only during his settlement.

Our former statute contained the word " settled," instead
of " ordained" minister ; and this change of phraseology

Londonderry
*vs.*
Chester.

seems to imply a change of sentiment in favor of ministers, though not " settled ;" and also an opinion, that though not " settled," a person may be a " minister." *Province Laws* 233, (*edit.* 1761.)

The 13th of Anne speaks of hiring " a minister or ministers," as if they were considered ministers, though not yet " settled" or hired. *Prov. Laws* 62.

In England, in the memorable case of *Horne Tooke*, it was held, both by parliament in his expulsion, and by the bar in refusing leave to him to practice law, that though quitting the society over which he was " settled," and though studying a new profession, he was not divested of the privileges and disabilities of a " minister."

It seems, also, from *Sanger vs. Inhab. of Roxbury*,(1) that though not settled, a person may, in Massachusetts, still possess the privileges of a " minister."

(1) 8 Mass. Rep. 265.

But as bearing upon this point, and as branching into a distinct question, it is contended, that though independent of any statute, a person not " settled" may be a " minister ;" yet the phraseology of this and our preceding laws on the same subject is such as to disqualify any minister, not " set- " tled," to solemnize marriage. Thus in Massachusetts, when power was first conferred upon the clergy to solemnize marriages, it was given only to ministers who were " set- " tled."(2) So in A. D. 1692, when we were united with that government, a statute passed, by which " settled minis- " ters" alone were authorized to perform the nuptial cere- mony.(3) And our provincial statute of the 13th of Anne retained the same expression.(4) The present statute, in- stead of " settled" ministers, says, " every ordained minister " of the gospel in the county where he is *settled*, or hath his " permanent residence."(5) It is argued, that the change of expression in this statute is merely accidental ; and that the authority is still meant to be confined to those who have a permanent residence in the county, by settlement over some society. But such is not necessarily the construction ; and we are inclined to the opinion, that the history of our

(2) Colonial Charters 242, 679.

(3) Col. Ch. 243.
(4) Prov. Laws 233, (edition 1761.)

(5) 1 N. H. Laws 350.

state for the last century furnishes a different reason for the alteration.

In England ministers had been accustomed to perform the ceremony *in facie ecclesiæ*, or in church ; and consequently in places where they were " settled." When this power was first conferred upon the clergy here, it would be natural not to make it more extensive ; and hence it was confined not only to " settled ministers," but to the town or parish in which they were settled. *Vide auths. ante.*

Again, it is to be considered, that our clergy then belonged mostly to one denomination, and by their tenets were allowed to be " settled" over particular societies. But, before our last statute, the discipline of some sects had become inconsistent with permanent settlements ; population had become so sparse, that settled ministers could not be maintained in every new town ; the fashion may have commenced, even among the older sects, to ordain missionaries without any settlement ; and upon the whole it is not improbable, that some of these considerations occasioned both a change in opinion and in the phraseology of the law. It seems, also, fully within the language of our statute, as well as its spirit, (if we ascertain its spirit by these considerations) that no penalty is incurred by the minister, provided he was duly " ordained," and had a " permanent residence" in the county, though not " settled." On all these points, however, opinions are likely to be influenced by theological belief ; and if the sounder opinion were, that Mr. *Brown* was not duly qualified to solemnize marriage, we still think, that the marriage itself was valid.

It is a principle, both salutary and well settled, that the official acts of a person, not duly qualified, are valid as to third persons and the public, when the want of the qualification is punished by a mere penalty, and when the acts themselves are not in their nature void, or are not expressly made void by statute.(1)

The minister in this case was an acting minister ; he was in the habit of performing ministerial duties ; he witnessed this contract of marriage in his official capacity ; and what-

ever may have been his want of qualification, we have before seen, that, by our statute, it is punished only by a penalty, and the marriage is in no case declared void.

This course of reasoning has long been familiar in respect to the publication of banns before marriage. But in both our statute and the English ones, the publication and the requisite qualification in the minister rest on the same foundation. There, before A. D. 1752, only a penalty was imposed for a neglect of the legal publication, as here for the same neglect and for any want of qualification in the minister; and there as well as here, that neglect was held not to avoid the marriage. *Com. Di.* " *Justice*," S. 25 & " *Poor*." —1 *Bl. Rep.* 367, *St. Devereux vs. N. D. Church.*—7 *Mass. Rep.* 55, *Milford vs. Worcester.* Till A. D. 1752, no act of parliament pronounced any marriage void, because not solemnized in any particular manner, or by any particular officer. 1 *Bl. Com.* 439.—2 *Burr.* 897.—*Burr. S. C.* 413, 416.—*Com. Di.* " *Baron & Feme.*" B.—3 *Burns' Just.* 372. But the 26th George II. pronounces the marriage itself to be void, as well for the neglect of publication as for the want of qualification in the minister,(1). It, also, expressly avoids marriages, if made without the consent of parents, and for such various other causes as have already rendered it a Pandora's box of evils. *Vid.* 26*th George II.*—*Bac. Ab.* " *Marriage.*"

But there is no pretence, that this act, though passed before our revolution, extended to the colonies; and the principles, upon which it was founded, were so foreign to our state of society, as never to apply here by construction. The tenure of much of their property ;(2) the perpetuity of estates in a landed aristocracy ;(3) the pecuniary character of the marriage contract under their form of government ;(4) and often the great and direct pecuniary interest of parents or guardians in the execution of this contract ; (2 *Bl. Com.* 70, 88.—1 *Leon.* 50, *Gray vs. Jeff.*—*Cr. El.* 55,) furnished a course of policy and reasons for this rigor, from which we are happily altogether exempt.

(1) 3 Maul. & Selw. 255.

(2) Mir. Jus. 11, 123.
(3) 1 Siderfin 387, King vs. Twisleton.
(4) 3 Maul. & Selw. 250, and notes.

Londonderry
*vs.*
Chester.

It only remains, then, to inquire, whether there is any thing in the nature of marriage, which renders it invalid, when solemnized by an acting minister, though not duly " ordain- " ed," nor " settled" within the county.

Both *Bracton b.* 1, *ch.* 5, and *Plowden* 445, agree, that the institution of marriage is derived from the law of nations, and that marriages may be formed by mutual agreement alone ; *fit per mutuam utriusque voluntatem quæ matrimonium appellatur.* It is a mere *civil* contract. *Mirror of Justice* 104.— 1 *Bl. Com.* 433.—*Selden's Table Talk.* 82. Its form and execution are subjects of civil laws and usages ; and religion has no legitimate concern with it, except to prescribe and enforce its duties. Those, probably, every religion, wheth- er pagan, mahometan, jewish, or christian, do prescribe, and ought to enforce.

It is one of the corruptions of popery, that marriage itself is a " sacrament" ; and, therefore, that the contract cannot be consummated or completed without the presence and aid of a priest. 4 *Reeves' Hist. En. L.* 52, 545.—*Justin. Inst.* 432. " Solemnization of marriage was not used in the " church before an ordinance of Pope Innocent III. ; before " which, the man came to the house where the woman in- " habited, and carried her with him to his house, and this " was all the ceremony." *Viner Ab.* " *Marriage*" *F.*—*Moor* 170, *Bunting's case.*—1 *Bl. Com.* 440.

In pursuance of this usurpation, the spiritual courts in England, till A. D. 1752, claimed the exclusive cognizance of marriages, and annulled or supported them according to their own ceremonies, decrees and interests.(1) But, at the reformation, different opinions began to prevail ; and, dur- ing the protectorate, priests were altogether forbidden to solemnize marriage.(2) Our own immediate ancestors never permitted them to do it till A. D. 1692. *Colon. Char.* 242, 152.—1 *Hutch. Hist.* 392.

Throughout New-England there is still conferred upon justices of the peace co-ordinate power to solemnize mar- riage. The form of the contract of marriage, as a mere civil transaction, is well enough established. Thus, if

(1) 1 Inst. 134. —1 Siderfin 13.—4 Coke 29.

(2) Salk. 120.

it be *per verba in futuro*, the contract is executory ; and if not afterwards executed, an action lies for damages alone.(1) Though, formerly, this kind of contract was specifically enforced by the ecclesiastical court, and its existence was considered a good cause of divorce.(2)   But if the contract be *per verba de presenti*, the marriage is complete ; and if the parties, being in other respects competent to contract, and not being influenced by fraud or force, employ such words, they become, by the operation of the contract alone, husband and wife, and are liable to the duties of their new relation. *Winthrop's Journal* 233.—1 *Holmes' Annals* 403.—*Viner's Ab.* " *Marriage*," *D.*—*Show.* 300.—6 *Mod.* 155.—*Coke Litt.* 34, *a.*—2 *Salk.* 438.—1 *Bl. Com.* 408.

Thus, says Lord Holt, " if the parties contract that they " are man and wife" ; or each that, " I marry you," it " amounts to an actual marriage ; it is as much a marriage, " in the sight of God, as if made *in facie ecclesiæ*." *Salk.* 437.—*Holt. Rep.* 458, *Collins vs. Jesser.*

In the *King vs. Brampton*,(3) Lord Ellenborough says, " certainly a contract of marriage, *per verba de presenti*, would " have bound the parties before" the statute of George II.; and in *Reed vs. Passer et al. (Peak Ca.* 232,) Lord Kenyon says, that such a contract " was *ipsum matrimonium*." By the Jewish customs the contract must, also, be in writing.(4) And at some periods of the civil law, cohabitation was necessary to perfect it. *Justin. Inst.* 422.

Among us, some kind of a *solemnization* of the contract has always been practised ; and it seems to be expedient, in order to give publicity to the act, and to prevent surprize, duress and deception.

In Scotland, it is a sufficient solemnization of the contract to acknowledge it before witnesses. *Burn's Ecclesiastical Law, title " Marriage.*"—4 *John.* 53.—1 *Hutch. Hist.* 392. By the Napoleon code, some religious ceremony may or may not be added, according to the inclination of the parties. Quakers, both in England and here, are left to their own customs on this point, and use no solemnization, except a recognition of the contract in one of their meetings.   1 *N.*

Londonderry
*vs.*
Chester.

(1)Vid. Auths. Derby vs. Phelps, post.
(2) 1 Bl. Com. 440.

(3) 10 East 288.

(4) 1 Camp. N. P. 61, 62, Horn vs. Noel.

Londonderry
vs.
Chester.

*H. Laws* 351.—*Bac. Ab.* "*M'age.*" The custom here among most, if not all other, sects, is to solemnize the contract before an acting magistrate or minister. But the form and manner of the ceremony differs among different sects and different magistrates and divines. It is not prescribed by statute, nor is it invariable by usage.

As the statute does not expressly require any solemnization whatever; and as the only duty devolved upon the justice or priest is to record the fact and certify it to the town clerk, this attestation of the contract seems to be the essence of the ceremony. That proves a guard against imposition or force ; gives publicity to the contract ; prevents illicit intercourse under the guise of matrimony ; and, by the record of the acting officer and of the town clerk, perpetuates evidence of a fact, which is often so important in disputes concerning inheritances and the settlement of paupers. 1 *Bl. Rep.* 367.—*Doug.* 172, 175, *Birt vs. Barley.*

There is nothing then in the nature of the contract of marriage, or in the nature of the solemnization of it, which require to their validity the presence and sanction of a minister duly " ordained" and " settled" within the county ; and the statute probably would not have imposed a penalty upon any person whatever for performing the ceremony of publicly attesting the contract, were it not that the record of the fact might thus be less accessible. A minister, settled at a distance, might not be so likely to make seasonable record, or return a certificate of the fact to the town clerk ; and the record, if made, might be at a greater distance. Again, if the number of qualified officers was greatly increased, search for the record of any particular marriage would be more difficult. But these considerations were not deemed of sufficient magnitude to avoid the marriage itself; and our statute only imposes a fine on the offending party. This fine is sufficiently large for an effectual check upon all sinister, sordid and wanton usurpations of the office of minister and magistrate ; or upon improper deviations by qualified officers from the provisions of the statute. In addition to this, if by a mere construction, not required by the nature

Londonderry
*vs.*
Chester.

of the case, nor by analogy to other statutes, the innocent contracting parties were subjected to indictment for fornication, and all their issue pronounced illegitimate, the consequence would be so disastrous, as alone to render doubtful the correctness of the construction.

Accordingly, it is said, in respect to this precise point, in *Reeve's Dom. Rel.* 157, that " a marriage, although not " celebrated by the legal officer, was, before the statute of " George II., always holden to be a sufficient marriage to " gain a settlement."

The same position is countenanced by the following authorities. 10 *East* 282, *Rex vs. Brampton.*—5 *State Trials* 610, *Fielding's case.*—1 *Siderfin* 64, *Tenney vs. Brown.*—3 *Lev.* 376.—*Salk.* 438.—1 *Bl. Com.* 408.—*Com. D.* " *Bar. & Fem.*" *B.*—2 *Insti.* 687.—*Dyer* 185, *a.*—4 *John.* 52, *Fenton vs. Reed.*—*Burr. S. C.* 91.

Under this view, the purity and sacredness of the marriage contract will remain no less, but rather more inviolate, than under a different construction. For now the contract will never be annulled for any accidental or designed irregularity, not extending to the essential grounds of the contract. And it is a matter of deep concern to the public, that when a contract, which changes so thoroughly the relation of the parties to the community, is first executed by them with deliberation, and afterwards consummated by cohabitation, it should not be lightly dissolved, and every thing done under it disannulled.(1)

(1) 3 Maul. &
Selw. 260.

We wish to be distinctly understood, that our opinions upon this last branch of the case, whose consideration we have now completed, rest upon the manifest distinction between a neglect of an acting officer to comply with some formality, and which neglect is punished only by a penalty, and between a neglect to comply with something essential to the nature or definition of the contract of marriage; and which neglect, by its character or by express statute, is made fatal to the contract itself.