NATIONAL UNION FIRE INSURANCE CO., and Market Pharmacy Co., Plaintiffs,

v.

Theodore BRITTON, Deputy Commissioner, Bureau of Employees Compensation, Defendant.

Civ. A. No. 544–60.

United States District Court
District of Columbia.

Sept. 26, 1960.

John F. Ellis, Washington, D. C., for plaintiffs.

Oliver Gasch, U. S. Atty., John F. Doyle and Ellen Lee Park, Asst. U. S. Attys., and Herbert P. Miller, Asst. Sol., Dept. of Labor, Washington, D. C., for defendant.

Saul M. Schwartzbach, Washington, D. C., for Evelyn Morton et al., defendants-intervenors.

HOLTZOFF, District Judge.

This is an action to review and set aside awards made under the Longshoremen's and Harbor Workers' Compensation Act, which has been adopted as the Workmen's Compensation Act for the District of Columbia.[1] As prescribed by statute, the action is brought by the insurance carrier and the employer against the Deputy Commissioner of the Bureau of Employees Compensation of the Department of Labor, who rendered the decision.[2] The beneficiaries of the awards, which were made for the death of an employee have intervened as additional party defendants. The matter is before the Court at this time on cross-motions for summary judgment. This Court recently had occasion to recapitulate the principles governing the scope of judicial review of workmen's compensation orders in Great American Indemnity Co. et al. v. Britton, D.C., 186 F.Supp. 938, and they need not be reiterated. There are two controverted issues in this case at this juncture: first, whether the injuries sustained by the deceased were connected with his employment, i. e., did they arise out of and in the course of, or because of the employment; and, second, whether the principal claimant is the lawful widow of the deceased on the basis of an alleged common-law marriage.

The essential facts involving the manner in which the deceased was killed are not controverted. What is in dispute are the inferences to be drawn from the evidence. The deceased, John P. Morton, was an employee at a drug store known as "The Market Pharmacy", located on 7th Street in downtown Washington. He served as a cook and the manager of the lunch counter. On the night of July 2, 1958 a customer named Brown came into the store and asked for a sandwich. After being served and making payment,

---

1. 33 U.S.C.A. § 901 et seq.; D.C.Code [1951] § 36-501.

2. 33 U.S.C.A. § 921(b).

he claimed that the sandwich was not satisfactory and asked for a refund. When his request was denied, Brown left, but shortly thereafter he returned and repeated his demand. At that time his money was repaid him. Nevertheless, Brown failed to depart from the premises, but lingered in the store for no apparent reason. The deceased asked Brown to leave but the latter declined to do so. The deceased then procured a knife, which he held in one hand, approached Brown, slapped him with his other hand, and ejected him from the premises. Brown thereupon obtained a pistol or a revolver and waited in the street outside of the store, apparently with the purpose of waylaying the deceased. The deceased, after completing his work for the night, left the store and as he started to walk down the street, Brown fatally shot him.

■■■ Manifestly, the deceased was not justified in brandishing a knife and assaulting Brown. He had not been menaced or threatened and no element of self-defense was involved. If Brown refused to leave the premises on request, the proper course for the deceased or his employer to pursue would have been to call the police. Nevertheless, Morton's misconduct does not dispose of the case. If, in the course of the performance of his duties, or in protecting the property of his employer, the employee uses excessive force as the result of bad judgment or recklessness on his part, this circumstance does not deprive him of the benefits of the Workmen's Compensation Act. On the other hand, if the employee is injured as a result solely of an act on his part committed with a wilful intention to injure or kill another, no compensation is payable. 33 U.S.C.A. § 903(b). When Brown killed the deceased, he, too, was not exercising any right of self-defense. Brown waited for the deceased to leave his place of employment and then attacked him. In other words, the earlier altercation between the deceased and Brown is a circumstance to be weighed and considered together with the remaining facts, but does not alone determine the issues.

■■■ In its ultimate analysis the question is whether on one hand the injury arose out of and in the course of the employment, or was caused by the wilful act of a third person directed against the employee because of his employment;[3] or whether, on the other hand, it was sustained in a personal quarrel or conflict independent of the employment. The evidence in this case is susceptible of either of two inferences: first, that in the course of his employment and in the performance of his duties as an employee, the deceased ejected Brown and the latter shot him in revenge; and, second, that the original altercation between the deceased and Brown was entirely personal and not connected with the employment of the deceased, and that this quarrel culminated in the shooting. It was the function of the trier of the facts, in this instance the Deputy Commissioner, to determine which of the two inferences should be drawn. He made the first deduction, as he had a right to do. Whether the Court would have reached the same conclusion is immaterial. The finding of the Commissioner on this point is supported by substantial evidence, even though there may be countervailing evidence on the other side. If either of two possible inferences may reasonably be drawn from the evidence, the decision as to which deduction should be made rests finally with the Deputy Commissioner. Such a finding of fact may not be set aside by the reviewing tribunal, Del Vecchio v. Bowers, 296 U.S. 280, 286–287, 56 S.Ct. 190, 80 L.Ed. 229. Consequently, the conclusion of the Deputy Commissioner that the death of the deceased is within the coverage of the Workmen's Compensation Act, may not be disturbed by the Court.

Both on the law and the facts, the case at bar is similar to Appleford v. Kimmel, 297 Mich. 8, 296 N.W. 861. There a theater usher evicted a disturber. On

3. 33 U.S.C.A. § 902(2).

his way home the usher was assaulted by the person whom he had ejected. It was held that the injury sustained by him arose out of and in the course of the employment and, therefore, was covered by the Workmen's Compensation law.

The next major question involved in this controversy is whether the principal claimant is the widow of the deceased. She contends that she was his wife by a common-law marriage, and the Deputy Commissioner so found. That she and the deceased lived together for many years is not disputed. The question is whether their relation was meretricious, or that of a common-law marriage.

 The words "common-law marriage" have at times been used somewhat loosely and, therefore, it seems appropriate to revert to a definition of the term. A marriage may be contracted in either of two ways: either by a ceremony witnessed by a minister of religion or by a civil officer authorized by law to do so, in which event it is denominated a ceremonial marriage; or by an agreement between a man and a woman to marry each other and to become husband and wife, as of the time of the consent, in which event the marriage is known as a common-law marriage. Both types of marriages are equally lawful, solemn, and binding. In order to constitute a common-law marriage, however, each of the two spouses must intend to enter into a permanent relation of husband and wife, and each must expressly covenant with the other to do so as of the time of the agreement. Nothing less will suffice. Moreover, such an agreement must be followed by cohabitation. Cohabitation, even though continued and prolonged, without an express agreement to enter into a permanent married state *in praesenti* would lead to the conclusion that the relation is a meretricious one, irrespective of reputation. Like any other fact, existence of the agreement to become husband and wife *in praesenti*, may be established either by direct or by circumstantial evidence. A conclusion of law that a common-law marriage was entered into and existed, may be predicated solely on a finding of fact based on circumstantial evidence that such an express agreement was made by the two spouses and was followed by cohabitation.

One of the latest and clearest statements of the law on this subject is found in the opinion of Judge Miller, in United States Fidelity & Guaranty Co. v. Britton, 106 U.S.App.D.C. 58, 60–61, 269 F.2d 249, 251, where the learned Judge wrote as follows:

" * * * when a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results.

"Thus, this court has followed the general rule that it is essential to the validity of a common-law marriage that parties legally capable of entering into that relationship mutually consent or agree to do so, but has added another essential,—that the agreement must be consummated by cohabitation if it is to result in a marriage.

" * * * when one of the parties to the alleged marriage asserts its existence but either denies or fails to say there was mutual consent or agreement, then mere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married."

 This discussion brings us to a consideration of the evidence on this point. Testimony was adduced, not only by the alleged widow, but also by other witnesses, that Morton, the deceased and the claimant, whose maiden name was Evelyn Harris, commenced living together in Charlottesville, Virginia, in 1942. She testified: "I thought we was married * * * because he said he was my husband, and I said I was his wife; so I just figured we was married." The Deputy Commissioner believed this

testimony, as he had a right to do, for he saw and observed the witness. These expressions, in effect, constituted a mutual agreement in words of the present tense to be husband and wife. Obviously, no set formula is required for this purpose, so long as the exchange of words inescapably and unambiguously implies that an agreement was being entered into to become man and wife as of the time of the mutual consent.

 Virginia, however, does not recognize common-law marriages. Offield v. Davis, 100 Va. 250, 263, 40 S.E. 910. Consequently the agreement to become husband and wife was not effective, when made, since the Virginia law created an impediment to the creation of such a marriage relation. In 1946 the couple moved to Washington, where they continued living together for about ten years. The District of Columbia recognizes common-law marriages. Consequently, the impediment to the inception of the marriage was removed and since the relation continued pursuant to the agreement entered into previously, a common-law marriage was created as soon as the couple moved to the District of Columbia and continued living there.

This precise situation was presented in Travers v. Reinhardt, 205 U.S. 423, 436–440, 27 S.Ct. 563, 51 L.Ed. 865. In that case the couple proposed to enter into a common-law marriage in Virginia. As the State of Virginia did not recognize such marriages, this contractual relation was not valid. Later the couple moved to Maryland, which likewise did not recognize common-law marriages. Subsequently, they took up residence in New Jersey, where they continued their cohabitation as husband and wife. New Jersey recognizes common-law marriages. The Supreme Court held that when the couple came into a State which sanctioned it, a valid common-law marriage came into being.

The testimony of the claimant on this issue was corroborated by other witnesses tending to show that the deceased held the claimant out as his wife by introducing her as such on various occasions; by taking out insurance policies in which he named her as his spouse; and by joining with her in executing a promissory note and a chattel mortgage. The policies, the note, and the chattel mortgage were introduced in evidence. Moreover, there was evidence on the part of a landlady, who appeared to be entirely disinterested, that mail was received by the claimant in which she was addressed as Mrs. Evelyn Morton.

Counsel for the plaintiffs stressed the fact that from 1956 until Morton's death in 1958, the parties lived apart, he in a room close to his work, and she and her two children with her mother in Maryland. The fact that a married couple separates obviously does not affect the validity of the prior marriage and, consequently, this circumstance appears irrelevant. Moreover, there was testimony showing that the parties lived in this manner for the last two years of Morton's life for economic reasons; that they met each other once or twice a week and spent the night together; and that the deceased regularly sent money to the claimant.

 There is, however, an unsavory aspect to the claimant's testimony. If her testimony was true, she had made false statements of a serious and grave nature in the course of her life in respect to the matters in issue, and even obtained public assistance from Maryland authorities by an outrageous falsehood. She explained these misstatements, however, to the satisfaction of the Deputy Commissioner. Whether the Court would have been satisfied with the explanation is manifestly immaterial. The credibility of the witness and the weight of the evidence was for the Deputy Commissioner to determine and he resolved them in her favor.

The situation presented here radically differs from that confronted in United States Fidelity & Guaranty Co. v. Britton, supra, which has been previously discussed. In the last-mentioned case, the alleged wife had expressly rejected the idea of marrying the man with whom she was living, pointing to the fact that

she was already married to another. After this impediment was removed by the death of her husband, no agreement was made by her with her paramour to become husband and wife. In the case at bar, the cohabitation was accompanied by an express agreement to be husband and wife *in praesenti*.

In the light of the foregoing considerations, the awards must be sustained.

The plaintiffs' motion for summary judgment is denied, and the defendant's motion for summary judgment is granted.