**Alphonso MARCUS, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U. S. DEPARTMENT OF LABOR, et al., Respondents.**

**No. 75–1629.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1976.

Decided Dec. 28, 1976.

Clement Theodore Cooper, Washington, D. C., for petitioner.

Joseph W. Pitterich, Washington, D. C., for respondents, Dickey's Dry Cleaners, Inc. and Home Indemnity Co.

Linda L. Carroll, Atty., Dept. of Labor, Washington, D. C., of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom George M. Lilly, Atty., Dept. of Labor, Washington, D. C., was on the brief for respondent, Director, Office of Workers' Compensation Programs.

Before TAMM, MacKINNON and WIL-KEY, Circuit Judges.

PER CURIAM:

Petitioner in this case, Alphonso Marcus, seeks our review[1] of an order of the Benefits Review Board of the United States Department of Labor, denying his claim for death benefits owing from the tragic shooting of his alleged common law wife during a robbery at her place of employment.[2] Petitioner's claim, filed pursuant to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq. (Supp. V, 1975) (Act), as extended to the District of Columbia by its Workmen's Compensation Act,[3] D.C.Code § 36–501 (1973), was the subject of a formal hearing before an ad-

---

1. Review by this court of such an order is authorized by 33 U.S.C. § 921(c) (Supp. V, 1975), as extended by D.C.Code § 36–501 (1973). The Act, as amended in 1972, authorizes a three-member Benefits Review Board to hear initial appeals from decisions of the administrative law judges, 33 U.S.C. § 921(b), who now have preliminary adjudicatory authority for claims arising under the Act, id. § 919(d).

2. Marcus v. Dickey's Dry Cleaners, 1 BRBS 480, BRB No. 74–233 (May 21, 1975).

3. The rules and regulations implementing these two statutes are codified at 20 C.F.R. §§ 701–702 (1975).

ministrative law judge (ALJ). The ALJ concluded from the extensive evidence introduced during two days of hearings, and from his observations of the various witnesses, that petitioner in fact had never been the common law husband of the decedent and therefore was not entitled to the benefits claimed. Petitioner's Appendix, Document 2, at 6, 13. This decision was upheld by the Benefits Review Board on appeal, and the petition for review was then filed with this court. Petitioner now argues: (1) that the denial of his claim was arbitrary, capricious and unsupported by substantial evidence; and (2) that the ALJ was biased against him and his counsel and, consequently, should have been disqualified. Finding no merit in either of these contentions, we affirm.

## I

 On the issue concerning petitioner's entitlement to death benefits as the common law spouse of the decedent, there is little dispute over the applicable law.

The Act defines the terms "widow or widower" to include:

> only the decedent's wife or husband living with or dependent for support upon him or her at the time of his or her death; or living apart for justifiable cause or by reason of his or her desertion at such time.

33 U.S.C. § 902(16) (Supp. V, 1975). Since the statute does not further define "husband" for purposes of determining coverage, the local law of domestic relations must supply its meaning.[4] In the case before us, both petitioner and decedent were domiciliaries of the District of Columbia, and it was within this particular jurisdiction that a common law marriage[5] was supposedly contracted. The full meaning of "husband", as used in section 902(16), thus should be determined by reference to the local law of the District of Columbia.

 The District of Columbia by judicial decision continues to recognize common law marriages, as all parties readily agree.[6] Meretricious cohabitation alone, however,

---

4. The meaning of a federal statute is a question of federal law, of course. However, where a statute fails to define one of its operative terms, and its legislative history cannot dispel whatever reasonable doubt exists as to the proper meaning of the term, a court must assume, in the absence of any applicable federal common law, that the legislature intended for local law to supply the meaning. Since there is no general federal common law of domestic relations, see De Sylva v. Ballentine, 351 U.S. 570, 580, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), the meaning of the term "husband" as used in the Act must be derived from the meaning commonly given it by local law. See Powell v. Rogers, 496 F.2d 1248, 1250 (9th Cir.), cert. denied, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); Albina Engine & Machine Works v. O'Leary, 328 F.2d 877, 878 (9th Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 35, 13 L.Ed.2d 29 (1964). See generally 2A Sutherland, Statutes and Statutory Construction §§ 50.03–.04, at 277–81 (4th ed. 1973).

5. The term common law marriage is something of a misnomer. The legal concept was adopted from England where it originated in the ecclesiastical rather than common law courts. See H. Clark, Law of Domestic Relations 45 (1968), citing II Pollock & Maitland, History of English Law 364–99 (1898). This peculiar matrimonial status has been recognized in numerous American jurisdictions from colonial times. See, e.

g., Fenton v. Reed, 4 Johns 52, 4 Am.Dec. 244 (N.Y.1809); Londonderry v. Chester, 2 N.H. 268, 9 Am.Dec. 61 (1820). Only a dwindling minority of states, however, still recognizes its legal validity. See Clark, supra, at 45–46 nn. 9–11. Some states have specifically abolished common law marriages by statute. See, e. g., 31 Minn.Stat.Ann. § 517.01 (1969). Attempts to abolish common law marriage in the District of Columbia by statute have, thus far, proved unsuccessful.

6. Petitioner's Brief at 25; Government's Brief at 18; Employer-Respondent's Brief at 4.

While no mandatory statute-provision governs its validity, this court held years ago in Hoage v. Murch Bros. Const. Co., 60 App.D.C. 218, 50 F.2d 983, 985 (1931), that a common law marriage would be recognized in the District of Columbia, as it had been at early English law, in the absence of any expression of contrary legislative intent. This holding remains the law to this day. E. g., Matthews v. Britton, 112 U.S.App.D.C. 397, 303 F.2d 408, 409 (1962); U. S. Fidelity & Guaranty Co. v. Britton, 106 U.S.App.D.C. 58, 269 F.2d 249, 251 (1959); Nat'l Union Fire Ins. Co. v. Britton, 187 F.Supp. 359, 363 (D.D.C.1960), aff'd, 110 U.S. App.D.C. 77, 289 F.2d 454, cert. denied, 368 U.S. 832, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961); McCoy v. District of Columbia, 256 A.2d 908, 910 (D.C.App.1969); Lee v. Lee, 201 A.2d 873,

has never been sufficient to establish a valid common law marriage either in this or any other jurisdiction still recognizing such a relationship.[7] In the District of Columbia at least, a valid common law marriage only results when

> a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife. . . .

*U. S. Fidelity & Guaranty Co. v. Britton,* 106 U.S.App.D.C. 58, 269 F.2d 249, 251 (1959).[8] The parties to this litigation do not dispute that a valid common law marriage cannot exist unless each of the foregoing elements is met; rather they disagree essentially over whether or not the evidence adduced was sufficient to sustain petitioner's burden of proving that he and the decedent had mutually agreed *in words of the present tense* [9] to enter into a permanent relationship as husband and wife.[10]

■ Such an agreement may at times be proved by either direct or circumstantial evidence, but where available,[11] the testimony of the parties is naturally preferred. *Id.* at 252. Here petitioner was available and actually did testify, as did various relatives and acquaintances of the two individuals. Petitioner's testimony, however, even when viewed most favorably, could only be characterized as ambiguous,[12] and the ALJ spe-

---

874 (D.C.App.1964); *Toye v. Toye,* 170 A.2d 778, 778 (D.C.App.1961).

**7.** *E. g., McCoy v. District of Columbia, supra* 256 A.2d at 910; *In re Gower Estate,* 445 Pa. 554, 556, 284 A.2d 742, 743 (1971); *Smith v. White,* 216 S.W.2d 672, 674 (Tex.Civ.App. 1948); *Humphreys v. Humphreys,* 364 S.W.2d 177, 178 (Tex.1963); *Deter v. Deter,* 484 P.2d 805, 806 (Colo.App.1971).

**8.** This statement of the rule coincides with the requirements delimited in the original decision recognizing common law marriage in the District of Columbia. See *Hoage, supra* at 985.

**9.** The legal prerequisites of a valid common law marriage, while easily stated, are "almost uniformly misunderstood . . . . [S]uch a marriage requires more than mere cohabitation coupled with adoption of the 'husband's' surname." *McCoy v. District of Columbia, supra* 256 A.2d at 910. The requirement that the parties must have mutually agreed in words of the present tense to live as husband and wife (the so-called *sponsalia per verba de praesenti*) is particularly elusive and difficult of direct proof.

> Obviously, no set formula is required . . . so long as the exchange of words inescapably and unambiguously implies that an agreement was being entered into to become man and wife as of the time of the mutual consent.

*Nat'l Union Fire Ins. Co., supra* at 364. The existence of an agreement may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship. *See id.* at 363. Any inference that might arise may nevertheless be rebutted by direct evidence that, in fact, there was no present agreement. *See U. S. Fidelity*

*& Guaranty Co., supra* at 252; *Clark, supra* note 5, at 49–50.

**10.** It appears that both petitioner and decedent were legally capable of becoming husband and wife (Tr. 102, 194, 280, 369–71), and neither respondent has claimed otherwise. Since both parties, too, undeniably cohabited for approximately eighteen months after the alleged marital agreement (Tr. 206, 470–71; Petitioner's App., Doc. 2, at 4), the essential issue litigated before the ALJ was whether or not they had agreed to become husband and wife *in praesenti.*

**11.** *See generally* D.C.Code § 14–302 (1973) (D.C. "Dead Man's Statute"), which only prohibits a judgment based on uncorroborated testimony in suits against persons legally representing a decedent or incompetent.

**12.** Petitioner testified on direct examination that he and decedent agreed:

> to live together and in the future, we supposed to get married.
>
> \*　\*　\*　\*　\*　\*
>
> The intention was to get married, but we didn't plan to get married at any moment. We just start.
>
> \*　\*　\*　\*　\*　\*
>
> Well, the relationship was to live as husband and wife.

Tr. 204–05. Also see Tr. 375–76, 381–82. It should be noted that contracting a valid common law marriage *per verba de praesenti* is not at all inconsistent with a further agreement to solemnize that marriage relation in the future by undergoing a public ceremony. Distinguishing the two agreements frequently presents intractable problems of proof, however.

cifically found that it was "sorely lacking in credibility" and that if any agreement at all "could possibly be found through his testimony, it would not be worthy of belief." Petitioner's Appendix, Document 2, at 10. The ALJ observed petitioner's demeanor at the hearing, as we did not, and it was for him to judge the credibility of any testimony and to weigh the evidence adduced therefrom. *See National Union Fire Ins. Co. v. Britton,* 187 F.Supp. 359, 364 (D.D.C. 1960), *aff'd* 110 U.S.App.D.C. 77, 289 F.2d 454, *cert. denied,* 368 U.S. 832, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961).

This brings us to the circumstantial evidence adduced by petitioner to establish that the requisite agreement *in praesenti* had been made. Various documents and

the testimony of several witnesses were offered, none of which the ALJ credited with much probative weight.[13] On the other hand, respondents introduced considerable evidence to rebut any inference that there had been a valid common law marriage, which the ALJ deemed far more reliable and creditable.[14] Thus, carefully weighing all the evidence before him, he concluded that a common law marriage had never been properly contracted.

■ It is well established that in such a case as this our scope of review is limited.[15] We may only assure that the findings of fact are supported by substantial evidence in the record and that the decision itself is not inconsistent with applicable law.[16] Since we conclude, as the

---

**13.** The ALJ discussed each of petitioner's exhibits cogently and in great detail. These ranged from a "congratulations card" sent to friends and signed only as "Joan and Fonso", and unsolicited letters addressed to decedent as "Joan Marcus", referred to by counsel for petitioner as "junk mail" (Tr. 222), to a promissory note showing "Joan Hawker Marcus" as a signatory. Petitioner's App., Doc. 2, at 7–10. The ALJ's findings that each of these exhibits was of dubious reliability and, therefore, entitled to little weight cannot be faulted. The same must be said of his finding that the testimony of other witnesses presented on behalf of petitioner failed to substantiate petitioner's claim. *Id.* at 12.

**14.** For example, certain witnesses testified that decedent only referred to petitioner as her "boyfriend" (Tr. 194, 196–97, 291–92), that she never acknowledged her marriage to relatives or employers (Tr. 141, 168, 434–35, 465–67), that she continued to date other men while living with petitioner (Tr. 172–73, 178, 186–87, 229–30), and that she even contemplated marriage to another man (Tr. 200). Likewise, all of decedent's employment records refer only to her maiden name (Hawker Ex. 9–11), as did her INS card, which had been revised months after she began living with petitioner (Resp. Ex. 1), her Certificate of Death (Marcus Ex. 4), and the Statement of Burial Expenses by Funeral Director (Hawker Ex. 3). Though present when information contained in these last two documents was provided, petitioner did not object to the notation on one that decedent left no surviving spouse, or to his being listed on the other as simply a "friend" of decedent. Tr. 145, 179, 187–88, 396; Petitioner's App., Doc. 2, at 13.

**15.** While our scope of review may be limited, our decision on appeal must not be inconsistent

with the strong policy favoring awards under the Act:

> Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficent purposes. Doubts, including the factual, are to be resolved in favor of the employee or his dependent family.

*Evening Star Newspaper Co. v. Kemp,* 175 U.S. App.D.C. 89, 92, 533 F.2d 1224, 1227 (1976), *quoting Friend v. Britton,* 95 U.S.App.D.C. 139, 220 F.2d 820, 821, *cert. denied,* 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955). In this case, however, the question is not whether an award will be made, but rather to whom. Were petitioner finally adjudged to have been the common law husband of decedent, her surviving child apparently would only be entitled to 16⅔% rather than 50% of her average weekly wage. 33 U.S.C. § 909(b), (c) (Supp. V, 1975). This disparity, though unappealing, may not influence the adjudication of petitioner's claim.

**16.** *Evening Star Newspaper Co., supra* at 1226, citing *Cardillo v. Liberty Mutual Co.,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947). *E. g., Wheatley v. Adler,* 132 U.S.App.D.C. 177, 407 F.2d 307, 309–10 (1968).

The Act, as amended in 1972 to provide for internal administrative review by the Board of initial contested decisions, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1251, provides that:

> The Board's orders shall be based upon the hearing record. The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole.

33 U.S.C. § 921(b)(3) (Supp. V, 1975). Although this addresses only the scope of review

Board did, that the ALJ's decision is unassailable in both respects, we may not and do not disturb it.

## II

Petitioner also claims that the ALJ "demonstrated personal bias, religious bias, and bias based upon the nativity of appellant in arriving at his decision," Petitioner's Brief at 18, specifying fifteen alleged occurrences substantiating his charge. No formal objection to perceived bias or prejudice was ever made during the hearing; the claim was first raised only on appeal to the Benefits Review Board which rejected it as untimely and "therefore" without merit.[17]

A party's claim of bias must not be made lightly. Such a charge, unfairly made, not only impugns without warrant the integrity of the government official publicly entrusted with responsibility for properly deciding a given dispute, but it also unnecessarily tarnishes our beneficent traditions of legal due process. It is especially important, too, that a charge of bias or prejudice be raised at once, whenever a party concludes in good faith that the decision-maker should be disqualified from hearing the case. If the issue of bias is raised in a timely fashion, permitting more prompt attention to the matter, each party's rights to a fair and impartial tribunal[18] are better protected. On the other hand, when a party voices its misgivings in tardy or dilatory fashion, not only may time and effort be wasted in the event that disqualification is ultimately required, but the good faith of the claimant will quite naturally be placed in some doubt.

To help preserve the integrity and efficiency of the administrative process, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (1970) (APA),[19] provides that:

> A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

*Id.* § 556(b). Whereas disqualification is mandatory under section 554(d) of the APA, 5 U.S.C. § 554(d) (1970), whenever a government employee or official would otherwise combine both prosecutorial and adjudicatory functions, disqualification under section 556(b) is entirely voluntary, although a decision not to disqualify oneself may be subject to subsequent review by the agency. *Id.* § 556(b). Compare 28 U.S.C. § 144 (1970) (mandatory disqualification of federal district judges upon filing of a time-

---

permitted the Board, the legislative history of the amendments makes clear that judicial review of Board decisions in the courts of appeal shall be limited to "the same 'substantial evidence' test." H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 12 (1972), U.S.Code Cong. & Admin.News 1972, p. 4698; *Nardella v. Campbell Machine, Inc.*, 525 F.2d 46, 47–48 (9th Cir. 1975); *Potenza v. United Terminals, Inc.*, 524 F.2d 1136, 1137 (2d Cir. 1975). *See also Atlantic & Gulf Stevedores, Inc. v. Dir., Office of Workers' Comp. Programs*, 542 F.2d 602, 605–06 (3d Cir. 1976); *Offshore Food Service, Inc. v. Benefits Review Board*, 524 F.2d 967, 968 (5th Cir. 1975).

**17.** In fact, the Board never addressed the actual merits of the claim, holding rather that by failing to object in a timely fashion petitioner had waived any objection. Petitioner's App., Doc. 3, at 5, *citing Kramer v. United States*, 166 F.2d 515, 518 (9th Cir. 1948) (disqualification of federal district judge under predecessor provisions of 28 U.S.C. § 144 (1970)).

**18.** *E. g., Johnson v. Mississippi*, 403 U.S. 212, 216, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971); *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954); *Cinderella Career and Finishing Schools, Inc. v. FTC*, 138 U.S.App. D.C. 152, 425 F.2d 583, 591 (1970); *Amos Treat & Co. v. SEC*, 113 U.S.App.D.C. 100, 306 F.2d 260, 267 (1962).

**19.** Procedures in respect of claims under the Act are governed by section 919 which now provides that "any hearing held under this chapter shall be conducted in accordance with the provisions of section 554 of Title 5." 33 U.S.C. § 919(d) (Supp. V, 1975). *Accord*, 20 C.F.R. § 702.332 (1975). Section 554 of the APA further provides that hearings are also to be held in accordance with sections 556 and 557. 5 U.S.C. § 554(c)(2) (1970).

ly and sufficient affidavit of bias or prejudice).

Petitioner here, however, never filed an affidavit articulating the facts and reasons justifying his charge, but chose instead to wait until after the initial adverse decision to raise these allegations in his briefs to the Board and, subsequently, to this court. Thus, not only did petitioner fail to execute the affidavit required by section 556(b), when from the nature of his allegations he would clearly have had occasion to do so, but his claim of disqualifying prejudice also must fail for want of timeliness. The general rule governing disqualification, normally applicable to the federal judiciary and administrative agencies alike,[20] requires that such a claim be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist.[21] It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process. The APA-mandated procedures afford every party ample opportunity to enforce and preserve its due process rights. Under the present circumstances, however, petitioner must be deemed to have waived his claim.

In any event, petitioner suffers not at all by his tardiness for our review of the record clearly establishes that his charge of bias is wholly devoid of merit. The mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune. While this proposition may appear self-evident, petitioner's enumerated contentions collapse to little more.[22]

Administrative Law Judge McGrail showed exemplary fairness and, we might add, considerable patience throughout the hearings. His supervision of the proceedings and his sedulous analysis of the facts and applicable law are to be commended, not impugned. Petitioner's charge of disqualifying bias is indeed unfortunate.

### III

This reviewing court may not function as a de novo fact-finding tribunal, nor weigh the evidence and substitute its independent judgment. Rather the scope of our review is limited to determining whether the findings of the ALJ are supported by substantial evidence in the record, and to assuring that the decision is not inconsistent with the applicable law. We can find no error in either respect.

Petitioner's claim of disqualifying bias must also fail for want of procedural compliance and merit. The Administrative Procedure Act expressly provides that the functions of an ALJ during a hearing, such as the one in question here, must be conducted in an impartial manner. 5 U.S.C. § 556(b) (1970). We find no fault whatsoever with the conduct of these proceedings.

---

**20.** *See NLRB v. Donnelly Co.*, 330 U.S. 219, 236–37, 67 S.Ct. 756, 91 L.Ed. 854 (1947); *Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512, 515–16 (4th Cir. 1974).

**21.** *Duffield, supra* at 515; *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 286 (7th Cir. 1966); *Int'l Paper Co. v. FPC*, 438 F.2d 1349, 1357 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971); *Kramer v. United States*, 166 F.2d 515, 518 (9th Cir. 1948); *Laughlin v. United States*, 80 U.S.App.D.C. 101, 151 F.2d 281, 284, *cert. denied*, 326 U.S. 777, 66 S.Ct. 265, 90 L.Ed. 470 (1945); *Bethlehem Steel Co. v. NLRB*, 74 App.D.C. 52, 120 F.2d 641, 652–53 (1941).

**22.** For example, one of the fifteen "extraneous matters" which petitioner contends raised "clear innuendoes" of bias, Petitioner's Brief at 18, consists of the following:

> 14. While the Trial Judge recognized himself that counsel had spent a great deal of time "showing there is a common law marriage" but yet [sic] ruled contrary to his belief and in total disregard of proof of a valid and existing common law marriage.

Petitioner's Brief at 16. In fact, all the ALJ recognized was that since petitioner's counsel had spent a great deal of time attempting to show that a common law marriage existed, counsel for respondents should have an opportunity for rebuttal. Tr. 374–75. Petitioner's interpretation of the ALJ's statement is clearly unreasonable.

The decision of the Board is affirmed in all respects.

*So ordered.*