269 F.2d 249
 UNITED STATES FIDELITY & GUARANTY COMPANY, a Corporation, et al., Appellants
v.
Theodore BRITTON, Deputy Commissioner, District of Columbia Compensation District, Bureau of Employees' Compensation, U. S. Department of Labor, Appellee.
 No. 14887.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 12, 1959.
 Decided July 16, 1959.
 
 Mr. J. Joseph Barse, Washington, D. C., with whom Messrs. H. Mason Welch, J. Harry Welch, Arthur V. Butler and Walter J. Murphy, Jr., Washington, D. C., were on the brief, for appellants.
 Mr. Herbert P. Miller, Atty., Dept. of Labor, with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee. Mr. Ward E. Boote, Atty., Dept. of Labor, also entered an appearance for appellee.
 Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.
 WILBUR K. MILLER, Circuit Judge.
 
 
 1
 This case arises under the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U.S.C. §§ 901 et seq.,* which is applicable in the District of Columbia, 45 Stat. 600, § 36-501, D.C.Code (1951).
 
 
 2
 Ernest Grayson died November 8, 1956, as a result of injuries sustained in the course of his employment. Willie Lee Grayson, alleging she was his commonlaw wife, claimed death benefits. The employer and the insurer contended Willie Lee Grayson had not been the common-law wife of the employee and therefore was not his widow. After an evidentiary hearing, the Deputy Commissioner found a common-law marriage existed between the claimant and the employee at the time of the latter's death, and accordingly found the claimant to be the employee's widow within the meaning of the Act. He awarded death benefits.
 
 
 3
 In the suit by the insurer and the employer for an injunction against the compensation award and order, the District Court entered summary judgment for the Deputy Commissioner. On this appeal therefrom, the sole question is whether a common-law marriage existed between Willie Lee Grayson and Ernest Grayson when the latter died.
 
 
 4
 The scope of our review is limited. In O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483, the Supreme Court said:
 
 
 5
 "* * * The standard, therefore, is that discussed in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. It is sufficiently described by saying that the findings are to be accepted unless they are unsupported by substantial evidence on the record considered as a whole. * * *"
 
 
 6
 The question before us is therefore properly stated as being whether the finding that a common-law marriage existed is supported by substantial evidence on the record considered as a whole.
 
 
 7
 Before discussing the question, however, we deem it necessary to decide what a common-law marriage is, and how its existence vel non is to be determined. Its essential characteristics and the proofs required to establish its existence vary among the jurisdictions which recognize such a status.
 
 
 8
 There is no statute here on the subject of common-law marriage, but in Hoage v. Murch Bros. Const. Co., 1931, 60 App.D.C. 218, 50 F.2d 983, this court defined the term and recognized the validity of the relationship so defined.[1] The opinion says, 60 App.D.C. at page 220, 50 F.2d at page 985: "* * * [A]n agreement between a man and woman per verba de praesenti to be husband and wife, consummated by cohabitation as husband and wife, constitutes a valid marriage * * *." This assumes, of course, that both parties are legally and physically capable of entering into the marriage relationship. So, whatever the rule may be elsewhere, in the District of Columbia it is that when a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results.
 
 
 9
 Thus, this court has followed the general rule that it is essential to the validity of a common-law marriage that parties legally capable of entering into that relationship mutually consent or agree to do so,[2] but has added another essential, — that the agreement must be consummated by cohabitation if it is to result in a marriage.
 
 
 10
 Obviously, these essentials must be proved in order to show a valid common-law marriage. Certainly mere cohabitation is not enough, even if reputation be added to it. It must at least appear that the parties cohabited as husband and wife in good faith, that is, that the cohabitation followed an express mutual agreement to be husband and wife. The best evidence of an express agreement is the testimony of the parties.[3] If neither is available as a witness, however, proof of cohabitation and general reputation as a married couple might, in some circumstances, be sufficient to warrant an inference of marriage by consent. But, when one of the parties to the alleged marriage asserts its existence but either denies or fails to say there was mutual consent or agreement, then mere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married.
 
 
 11
 With these principles in mind, we turn to examine the findings of the Deputy Commissioner on the marriage question. They are as follows:
 
 
 12
 "That in 1945 the employee * * and the claimant * * * began to live together and to cohabit;
 
 
 13
 "That prior to such time, on February 4, 1926, the claimant had gone through a marriage ceremony with one Harry Lee, but that such ceremony did not create a legal marriage since the said Harry Lee was then the husband of one Carrie Robinson Lee, to whom he was married on December 28, 1921; that the said Harry Lee died on October 10, 1952, leaving the said Carrie Robinson Lee as his surviving widow;
 
 
 14
 "That the claimant and the employee lived together as husband and wife and introduced one another as such to their relatives and acquaintances and were generally known as such from 1945, when they began to live together and cohabit, as found above, until the time of the employee's death; that during the said period the claimant was dependent upon the employee and he supported her;
 
 
 15
 "That on January 14, 1948, the employee designated the claimant as beneficiary of the proceeds of insurance on his life and noted her relationship to him as cousin, and on July 23, 1956, he designated the claimant as his dependent sister in the records of his union's trust fund; that his actions in so doing are unexplained; that the claimant was neither the cousin nor the sister of the employee, and the claimant and the employee continued to live together as husband and wife, as found above;
 
 
 16
 "That a common-law marriage relationship existed between the claimant and the employee at the time of the employee's death, and the claimant is the employee's widow within the meaning of the District of Columbia Workmen's Compensation Act * * *."
 
 
 17
 It is at once seen that the Deputy Commissioner rested his ultimate finding of a common-law marriage upon his previous findings of mere cohabitation and reputation, and that he did not find the cohabitation to have been under circumstances which would warrant the inference that it was pursuant to a mutual agreement to be married. Nor did he find that the parties had mutually agreed, or that either had agreed, to be husband and wife; no doubt because there is no evidence in the record upon which he could have based a finding to that effect. In fact, the evidence is to the contrary.
 
 
 18
 Instead of finding Ernest Grayson had consented or agreed to a common-law marriage, the Deputy Commissioner merely recited conduct by him which was inconsistent with consent or agreement, and then dismissed it as "unexplained." Willie Lee, who would have known of Grayson's consent or agreement if there had been any, testified as follows:
 
 
 19
 "Q. Do you know if he [Grayson] considered you his wife?
 
 
 20
 "A. I don't know what he considered, sir, I really don't. But I am just telling you what I consider [sic]. I know he acted like he did."
 
 
 21
 Willie Lee did not testify there was mutual consent or agreement at any time, nor that she had consented or agreed. Rather, she expressly said she never intended to marry Grayson during the life of Harry Lee, to whom she mistakenly thought she was lawfully married. The transcript of her testimony contains the following:
 
 
 22
 "Q. When you told Grayson that you weren't going to marry anyone while you had a living husband, that was when you first started living with him?
 
 
 23
 "A. Yes, sir.
 
 
 24
 * * * * * *
 
 
 25
 "Q. And so at that time you believed that Lee was still your husband and he was still living, and that you couldn't marry Grayson, is that right?
 
 
 26
 "A. Yes. I don't like to do that. I am telling you the truth, I have got to die sometime and that is what I am thinking about and I don't want to die with no two or three husbands on my hands. I would rather wait, if it ever come a chance I could marry, I would be doing the right thing. People say I have old-fashioned ways, and maybe I have. My grandmother was an old lady that raised me."
 
 
 27
 Willie Lee substantially repeated this statement later in her testimony:
 
 
 28
 "Q. You knew you were married to whom?
 
 
 29
 "A. To Harry Lee, I knew I was married to him.
 
 
 30
 "Q. And you knew you couldn't marry Grayson?
 
 
 31
 "A. That is right. I felt I couldn't and be doing right."
 
 
 32
 We think this conclusively shows that, at least as long as Harry Lee lived, which was until October 10, 1952, Willie Lee Grayson did not intend to, and in fact did not, consent or agree to enter into a common-law marriage with Ernest Grayson. In the face of this affirmative statement by one of the parties that she did not intend to enter into a common-law marriage, evidence as to cohabitation and reputation before that time is not only unconvincing but also immaterial.
 
 
 33
 As both were legally free to marry had they chosen to take that step, and as mutual consent or agreement was admittedly lacking, their cohabitation was meretricious at its outset in 1945 and continued so at least until October 10, 1952. Cohabitation which was meretricious in its inception is considered to have the same character throughout its continuance after the removal of a real or supposed impediment. Cohabitation continued thereafter could not ripen into a common-law marriage unless it was pursuant to a mutual consent or agreement to become husband and wife made after the removal of what she supposed was a barrier.[4]
 
 
 34
 The question then is whether the evidence as a whole shows that, after October 10, 1952, Grayson and Willie Lee mutually consented or agreed to the formation of a common-law marriage. The mere continuance of the originally meretricious cohabitation did not give rise to an inference that Willie Lee and Grayson definitely mutually agreed, after Harry Lee's death, to be husband and wife. Nor is there any evidence to that effect. Willie Lee did not testify there was a mutual agreement, either before or after October 10, 1952. Had there been such an agreement she would have known it and would have testified about it. Indeed, she indicated there was no such mutual agreement.[5] She denied knowing what Grayson's intentions were, as we have already shown.
 
 
 35
 We conclude the evidence on the record as a whole does not support the Deputy Commissioner's finding of a common-law marriage, but plainly shows the contrary. The judgment is reversed and the case is remanded to the District Court with instructions to set aside the compensation award and to order the claim dismissed.
 
 
 36
 So ordered.
 
 
 
 Notes:
 
 
 *
 33 U.S.C.A. § 901 et seq
 
 
 [1]
 In the Hoage case the court upheld the Deputy Commissioner's ultimate finding that there had been a common-law marriage which was based on a finding "that Sadie Turner Sutton and deceased had lived together in good faith for a period of about three years as husband and wife, and had held themselves out to the public" as such. An examination of the transcript of evidence shows, however, that Sadie Turner Sutton testified of an express agreement between Sutton and herself. It follows that, in finding they had cohabitedin good faith, the Deputy Commissioner was holding they had done so pursuant to a mutual agreement to enter into the marriage relation.
 
 
 [2]
 State ex rel. Foster v. Anders, 1938, 135 Fla. 59, 184 So. 515; Marsicano v. Marsicano, 1920, 79 Fla. 278, 84 So. 156, 158; Davidson v. Ream, 1916, 97 Misc. 89, 161 N.Y.S. 73, 84
 
 
 [3]
 In Anderson v. Anderson, 1956, 235 Ind. 113, 131 N.E.2d 301, 306, the court held:
 "* * * Cohabitation, reputation, or other conduct may corroborate evidence that there was a contract, or in the absence of testimony by one of the parties as to what the agreement was, if any, it might, in a strong case, be sufficient to draw the inference that there was a contract to marry in the present tense, but the contract must be formed by what was said and done by the parties, and when the testimony of the party asserting and relying upon the contract discloses there was no language in the present tense constituting a contract to marry, then cohabitation, reputation and other conduct cannot constitute words which were never spoken or used."
 In Carretta v. Carretta, Fla.1952, 58 So.2d 439, 441, the rule was set forth as follows:
 "The best evidence to establish common-law marriage would be the testimony of the contracting parties, or others who may have been present when the agreement was entered into. In Le Blanc v. Yawn, [1930, 99 Fla. 328, 126 So. 789] we held that proof of general repute and cohabitation as man and wife will support a presumption of marriage when the agreement is denied and cannot be proven by the best evidence. In this case the appellee was present before the Examiner and testified. If there was an agreement to presently become husband and wife, she could have testified as to that agreement. Her testimony would have been the best evidence. She gave no such testimony.
 "The proof in this case falls far short of showing a prima facie common-law marriage as required in this State." (Italics in original.)
 
 
 [4]
 See Thomas v. Murphy, 1939, 71 App. D.C. 69, 70, 107 F.2d 268, 269, where this court said: "Where cohabitation was, at the outset, illicit from choice, because there was nothing to prevent a valid marriage, it is reasonable to require some evidence of a change of intention before finding a marriage * *." See also Rittgers v. United States, 8 Cir., 1946, 154 F.2d 768, 771; Anderson v. Anderson, supra; Pierce v. Pierce, 1946, 355 Pa. 175, 49 A.2d 346
 
 
 [5]
 "Q. Did the two of you ever talk about getting married?
 "A. Yes, sir. He [Grayson] talked about it, but I think we would have gotten married anyway, but before Mr. Lee died, I just told him I wasn't going to marry anybody while I had a living husband, and then after Mr. Lee died, it wasn't too long before he died." (Our emphasis.)
 The interval was more than four years. It is immaterial whether Grayson "talked about" a ceremonial or a common-law marriage because she did not agree to either. Satisfied with the status quo, they did not make an agreement after Lee's death.