JOSHUA LYNN JENNINGS *v.* ANN MAE JENNINGS,
PERSONAL REPRESENTATIVE OF THE
ESTATE OF JAMES LENWOOD JENNINGS

[No. 340, September Term, 1973.]

*Decided March 8, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN
and MENCHINE, JJ.

*Stanley Jay Katz*, with whom was *Merle F. Maffei*
on the brief, for appellant.

*Joseph C. Roesser* and *Margaret D. Farthing* for appellee.

ORTH, C. J., delivered the opinion of the Court.

The question in this case is whether Annie Mae Jennings (Annie) is the surviving spouse of James Lenwood Jennings (James).

I

On 1 August 1972 Annie filed a petition for probate in the Orphans' Court for Prince George's County. The petition showed that James, domiciled in Prince George's County, Maryland, died on 7 July 1972 at Farmville, Virginia, without a will, leaving Annie as his surviving spouse.[1] Code, Art. 93, § 5-201.[2] On 2 August the Register of Wills issued an administrative probate order appointing Annie personal representative of James's estate. § 5-302. Notice of appointment and Notice to creditors was given. On 28 August, Joshua Lynn Jennings (Joshua) petitioned for judicial probate, objecting to the appointment of Annie as personal representative. §§ 5-304, 5-401, and 5-402. The petition averred that Annie was not the wife of James. Notice to all persons interested in the estate was given on 6 September. § 5-403. There was a hearing for judicial probate on 14 February 1973, § 5-404, before the Orphans' Court. The same date, Joshua filed a petition for probate, in which he showed, as had Annie in her petition, that James, domiciled in Prince George's County, died 7 July 1972 at Farmville, Virginia, without a will. He declared he was the father of James and that James was not married. The acceptance and consent of Joshua as personal representative was filed on 20 February and his bond filed and approved on 20 February. Under date of 27 February the Orphans' Court ordered that the order for administrative probate entered 2 August 1972 appointing Annie personal representative "is hereby revoked", that the estate be admitted to judicial probate and

---

1. A list of "all persons interested in the estate" contained only the names of Annie, as surviving spouse, and "Tamala Jeanne", age 8, as surviving issue.

2. Unless otherwise indicated, reference to sections of the Code hereafter are to sections of Art. 93.

that Joshua be appointed personal representative. It "adjudged and decreed" that Annie "was not married to the Decedent at the time of his death."[3] On 9 March the Orphans' Court, upon petition of Annie for an appeal, granted the petition and ordered that the estate, No. 21,988 "be transferred to the Circuit Court for Prince George's County from this Court for de novo hearing on the appeal." Courts Art. § 12-502. It stayed the order of 27 February and all further proceedings by the Orphans' Court. Upon hearing de novo in the Circuit Court for Prince George's County, the court, on 25 June 1973, adjudged and decreed that at the time of James's death Annie was "his lawful surviving spouse" and ordered that "The Order of the Orphans' Court dated February 27, 1973 is reversed; and Estate No. 21,988 is remanded to the Orphans' Court for further administrative probate by that Court in accordance with Letters of Administration initially granted to Annie Mae Jennings within the purview of Article 93, § 5-104, Annotated Code of Maryland." Joshua noted an appeal to this Court.[4] Courts Art. § 12-301.

---

3. In the order Annie's name was given as "Ann Mae Jennings."

4. Under the present status of the law, except for Montgomery County, there may be an initial appeal from a final order of an orphans' court either to the Court of Special Appeals, Courts Art. § 12-501, or to the circuit court for the county (or to the Superior Court of Baltimore City), Courts Art. § 12-502 (a). If a party first appeals to the circuit court (or in Baltimore City to the Superior Court of Baltimore City), under § 12-502 (a), a further appeal by a party from the final order of that court, acting in an appellate capacity, is authorized to the Court of Special Appeals under § 12-301. This was expressly set out in the former law. Code, Art. 5, § 9, authorized appeals from a final judgment of an orphans' court to the Court of Appeals. Code, Art. 5, § 5 c (b) (15) gave the Court of Special Appeals exclusive initial appellate jurisdiction in any case over which an orphans' court has original jurisdiction. Code, Art. 5, § 25, provided that, except in Montgomery County, instead of a direct appeal to the Court of Appeals pursuant to § 9, a party could appeal to the circuit court for a county or the Superior Court of Baltimore City, where the appeal shall be heard de novo. Section 25 continued: "From the final judgment or determination of said circuit court or superior court there shall be a further right of appeal to the Court of Appeals pursuant to the provisions of § 1 of this article." Section 1, as amended, provided for appeal to the Court of Appeals, unless the suit or action or prosecution is subject to the appellate jurisdiction of the Court of Special Appeals, in which event any party may appeal to the Court of Special Appeals from such judgment or determination (except as to appeals heard by "a court of law" from a judgment of the District Court).

The code revisions which now appear as Courts Art. §§ 12-501 and 12-502

## II

The relationship of Annie and James, up to a point, is not in dispute. On 8 January 1955, in the District of Columbia, Annie married William Bell Perry, Jr. On 3 March 1959 in New York City, New York, while still married to Perry, she married James. A child, Tamala Jeanne, was born to Annie and James on 18 June 1964. On 26 February 1970, effective 26 March 1970, in the District of Columbia, Annie was granted an absolute divorce from Perry. On 28 October 1970 she filed an action in the Circuit Court for Prince George's County for divorce *a vinculo matrimonii* from James, alleging constructive desertion. James died 7 July 1972.

Annie claims that between 26 March 1970, the effective date of her divorce from Perry, and 7 July 1972, the date of James's death, she lived with James in the District of Columbia under such circumstances as to create a valid common-law marriage between her and James. Joshua contends that the requirements of a common-law marriage were not met.

## III

It is the law of this State, and Annie and Joshua so concede, that, although a common-law marriage may not be contracted in Maryland,[5] "[w]e have adopted the generally accepted rule that where a valid common-law marriage has been entered into in a jurisdiction which recognizes the

---

(a) made only stylistic changes. Although the express provision for further right of appeal to the Court of Special Appeals does not appear in the statutes as revised, the substance of the former law was not intended to be changed. The revisor's note to Courts Art. § 12-502 (a) says: "This subsection is the substance of Article 5, § 25, giving effect to recent legislation regarding appellate jurisdiction." This intention is effectuated by the "appeal from final judgment" language of § 12-301, combined with the fact that § 12-302 does not except from § 12-301 the type of case here under consideration.

5. "The law in Maryland has thus long been established that a common-law marriage is not valid. * * * The requirements of the Maryland statute as to the formalities of marriage are mandatory, and hence a religious ceremony must be super-added to the civil contract to make the contract of marriage valid." *Henderson v. Henderson*, 199 Md. 449, 454. Since *Henderson* was decided, marriages in this State may be solemnized by a civil ceremony, Code, Art. 62, § 3 A, but the statutory formalities must still be observed.

validity of such a marriage, it will be recognized as valid in another jurisdiction, regardless of the rule which prevails in the latter jurisdiction in respect to the validity of common-law marriages." *Henderson v. Henderson*, 199 Md. 449, 459. *Henderson* concerned a common-law marriage in the District of Columbia. The Court said, at 456:

"Common-law marriages are recognized in the District of Columbia. In *Thomas v. Holtzman*, 7 Mackey, 18 D.C. 62, 66, the Supreme Court of the District of Columbia, by Judge Merrick, said: 'In the first place it is not at all apparent that it ever was the law that a marriage *in facie ecclesiae,* was necessary for the purpose of legitimating the issue. It is true that the Court of Appeals of Maryland in the last four or five years has decided that such was the law, but that decision is not binding upon us. It is laid down by Blackstone that a marriage *per verba de praesenti* without the intervention of a clergyman is a legitimate marriage. And both Story and Kent say, that according to the universal understanding in this country a marriage *per verba de praesenti*, without the intervention of a clergyman, followed by cohabitation, makes a legitimate marriage.' "

The law in the District of Columbia is still as it was found to be in *Henderson.*[6] In *McCoy v. District of Columbia,* 256 A. 2d 908 (1969) the District of Columbia Court of Appeals said, at 909-910, citing *Lee v. Lee,* 201 A. 2d 873 (D.C. App. 1964), "That common-law marriages are recognized as lawful in the District of Columbia is clear." Almost four decades before, in *Hoage v. Murch Bros. Const. Co.,* 50 F. 2d 983, 985 (1931) the Court of Appeals of the District of Columbia concluded that the decision of the Supreme Court of the

---

**6.** Annie served notice to the Circuit Court and Joshua that she intended to rely upon the District of Columbia law and the Maryland acceptance of it. Code, Art. 35, § 50. See *Coppage v. Resolute Ins. Co.,* 264 Md. 261; *Morris v. Peace,* 14 Md. App. 681, *cert. den.,* 266 Md. 740. See also, Code, Art. 3, § § 47, 48. The cited statutes are now codified as Courts Art. § § 10-504, 10-501 and 10-502, respectively.

District of Columbia that common-law marriages in the District of Columbia were invalid was not supported by law and was wrong. In so holding, it indicated what was required for the validity of a common-law marriage in its jurisdiction: "* * * [A]n agreement between a man and woman [7] *per verba de praesenti* to be husband and wife, consummated by cohabitation as husband and wife, constitutes a valid marriage, unless there be in existence in the state in which the agreement is made a statute declaring the marriage to be invalid unless solemnized in a prescribed manner." It found no such statute in the District of Columbia. In *United States Fidelity & Guaranty Co. v. Britton*, 269 F. 2d 249 (1959), the United States Court of Appeals, District of Columbia Circuit, under the authority of *Hoage*, said, at 251:

> "So, whatever the rule may be elsewhere, in the District of Columbia it is that when a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results." [8]

Obviously, the court continued, these essentials — the agreement and the consummation must be proved in order to show a common-law marriage. It expounded on the agreement and its proof. It pointed out that mere cohabitation is not enough, even if reputation is added to it; the cohabitation must be in good faith. It would be in good faith if it followed "an express mutual agreement to be husband and wife." At 252. It described the proof necessary to show the express agreement:

---

7. Maryland does not recognize a marriage between persons of the same sex. "Only a marriage between a man and a woman is valid in this State." Code, Art. 62, § 1, as amended by ch. 213, Acts 1973.

8. The court explained that it was thus following the general rule that it is essential to the validity of a common-law marriage that parties capable of entering into their relationship mutually consent or agree to do so, but that it had "added another essential, — that the agreement must be consummated if it is to result in a marriage." *Idem.*

"The best evidence of an express agreement is the testimony of the parties. If neither is available as a witness, however, proof of cohabitation and general reputation as a married couple might, in some circumstances, be sufficient to warrant an inference of marriage by consent. But, when one of the parties to the alleged marriage asserts its existence but either denies or fails to say there was mutual consent or agreement, then mere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married." 269 F. 2d, at 252.[9]

Therefore, when mutual consent or agreement is lacking, cohabitation would be meretricious.

In *McCoy v. District of Columbia, supra,* the District of Columbia Court of Appeals placed complete reliance on *Britton,* applying it to affirm a judgment of the Court of General Sessions that Marie L. McCoy was not the common-law wife, and thus was not the widow, of Hurland T. McCoy. It said, on the authority of *Britton,* that it is clear that proof of a common-law marriage must derive from evidence that the cohabitation followed an express mutual agreement to be husband and wife. Close examination of the record failed to disclose any evidence relating to such an agreement. Moreover, it continued, it cannot validly be contended on the record that existence of such agreement could be inferred from proof of cohabitation and reputation:

"While it is true that when neither of the parties is available as a witness the requisite agreement might, through inference, be established from cohabitation and reputation, it is the law in the District of Columbia that

* * * when one of the parties to the alleged

---

**9.** In *Britton* there was an affirmative statement by one of the parties that she did not intend to enter into a common-law marriage. The court said: "In the face of this affirmative statement * * *, evidence as to cohabitation and reputation before that time is not only unconvincing but also immaterial." *Idem.*

marriage asserts its existence but * * * denies or *fails* to say there was mutual consent or agreement then mere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married. *United States Fidelity & Guaranty Co. v. Britton, supra,* (emphasis supplied)." 256 A. 2d, at 910.

Accordingly the court concluded, the record not only supported, but compelled the finding of the trial court that there was no valid common-law marriage.[10]

It seems, however, that the strict rule of the District of Columbia as to proof of the mutual agreement to marry may be tempered somewhat when an impediment to a valid marriage existed at the time cohabitation commenced. The Court of Appeals of Maryland discussed the point in *Henderson,* 199 Md. at 456-457:

"It has been held by the United States Court of Appeals for the District of Columbia that the removal of an impediment to marriage while parties continue to live together as husband and wife in the District of Columbia gives rise to a common-law marriage. *Thomas v. Murphy,* 71 App. D.C. 69, 107 F. 2d 268; *Parrella v. Parrella,* 74 App. D.C. 161, 120 F. 2d 728. In *McVicker v. McVicker,* 76 U.S. App. D.C. 208, 130 F. 2d 837, where the parties were married in Virginia before the end of the six-month waiting period prescribed by the decree, which divorced the husband from his former wife, but relying on the ceremonial marriage lived together as husband and wife in the District of Columbia for more than two years, the Court held that the removal of the impediment to marriage

---

10. Marie McCoy testified that she "married" Mr. McCoy in August 1947. "The balance of her testimony was an effort to demonstrate absence of any impediment to the asserted marriage, cohabitation and a general community reputation reflecting a marital state. Numerous documents were introduced to aid in establishing such a reputation or a mutual holding out to the public that the two were husband and wife." 256 A. 2d, at 909.

while the parties continued to live together as husband and wife gave rise to a common-law marriage."

The Court discussed the rule further in applying it to the facts of the case before it, *id.*, at 457-458:

"It is recognized in jurisdictions where formal solemnization of marriages is not necessary that where the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability, as where there is a prior marriage undissolved, their cohabitation, thus matrimonially meant, will in law make them husband and wife from the moment when the disability is removed. It is immaterial whether or not they knew of its existence or its removal. Such a case presents mutual present consent and consummation. Although cohabitation was introduced by a formal marriage ceremony, and the parties supposed erroneously that the impediment of a former marriage had been taken away, and never had their mistake corrected, nevertheless, in jurisdictions where formal solemnization is not necessary, valid marriage may be presumed to have occurred after the impediment was removed. As Bishop points out, 'the living together of marriageable parties a single day as married, they meaning marriage, and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony.' 1 Bishop, Marriage, Divorce and Separation, sec. 975."

*Thomas v. Murphy, supra,* cited in *Henderson,* supports the rule as construed by the Maryland Court of Appeals. In *Thomas,* the removed impediment consisted of the marriage of one of the parties. The court said, 107 F. 2d, at 269:

"Cases where, as here, one or both of the parties knew of the impediment, have sometimes been

treated as exceptions to the general rule that the mere removal of the impediment, with continued cohabitation, results in a common-law marriage; on the theory that the original intent was meretricious, and evidence of a changed intent is therefore necessary. But the general rule, which finds a common-law marriage upon the removal of the impediment, has sometimes been applied though one or both of the parties knew of the impediment. Since marriage is preferable to concubinage, this result seems socially sound. It is also logical. Where cohabitation was, at the outset, illicit from choice, because there was nothing to prevent a valid marriage, it is reasonable to require some evidence of a change of intention before finding a marriage; but where, as in the present case, marriage at the outset was impossible, there is no good reason for demanding such a change." (footnote citations omitted).

The court held that a common-law marriage occurred after the impediment was removed by divorce, stating: "The intent * * * may well have been * * * matrimonial from the first, although one or both of them knew that this intent could not at first be realized. We intend much that we cannot achieve. It may be supposed 'that the parties intended matrimony as soon as they lawfully could, and by their continued conduct after the removal of the impediment actually married by agreement.' " [11]

Shortly after the decision in *Thomas*, the District Court of the United States for the District of Columbia had two occasions to look at the "widely held" rule that the removal of an impediment while parties continue to live together as husband and wife gives rise to a common-law marriage. *Williams v. Williams*, 33 F. Supp. 612, and *Parrella v. Parrella*, 33 F. Supp. 614 (cited in *Henderson*), each decided

---

11. The quotation by the court is given as "Madden, Persons and Domestic Relations, p. 74."

11 June 1940, applied the *Thomas* rationale. In *Williams*, the judge said, at 613:

> "[E]ven if the ceremonial marriage of the parties herein should be void because of a living spouse of one of the parties at that time, I am of the opinion that the application of the principles which justify a common-law marriage, which is recognized in this jurisdiction, would compel the conclusion that the parties hereto did become husband and wife upon the death of such former spouse during the time the parties hereto were living in this jurisdiction as husband and wife. It is certainly not to be presumed that the former husband, not heard from in thirty years, continued to be an impediment to such union, and, if an impediment to a lawful union be removed, and that union continues, the salutary principles announced by our Court of Appeals in Thomas v. Murphy, 71 App. D.C. 69, 107 F.2d 268, 269, decided October 9, 1939, should apply."

The judge supported his view with the major part of the quote from *Thomas* we have set out above.[12]

*Parrella* was to like effect. The court said, at 614:

> "Even though the ceremonial marriage was not valid, because the defendant at that time had a living spouse, there is no doubt that the intent of the parties was matrimonial, and not meretricious. The parties lived together as husband and wife in the District of Columbia, in which jurisdiction common-law marriage is recognized. Even though there was an impediment to a valid marriage at the time of the ceremony, it would be thwarting the true objective of that legal policy to hold that, when such impediment was removed by death, and the

---

12. The judge was persuaded that "if *Tendler v. Tendler*, 56 App. D.C. 296, 12 F. 2d 831, indicates the contrary, that case has been, in that respect, by the case of *Thomas v. Murphy, supra*, substantially modified sub silentio." 33 F. Supp., at 613.

parties continued to live together, their relation as husband and wife cannot be recognized."

And *McVicker v. McVicker, supra,* decided in 1942, as the Court of Appeals of Maryland pointed out in *Henderson,* held flatly that in the District of Columbia, the removal of an impediment while parties continue to live together as husband and wife gives rise to a common-law marriage. 130 F. 2d, at 837. *United States Fidelity & Guaranty Co. v. Britton, supra,* is not to the contrary. In that case both parties were legally free to marry had they chosen to take that step, but mutual consent or agreement was admittedly lacking. Thus, reasoned the court, their cohabitation was meretricious at its outset. "Cohabitation which was meretricious in its inception is considered to have the same character throughout its continuance after the removal of a real or supposed impediment. Cohabitation continued thereafter could not ripen into a common-law marriage unless it was pursuant to a mutual consent or agreement to become husband and wife made after the removal of what she supposed was a barrier." 269 F.2d, at 253-254. See note 9, *supra.*[13]

We find the law of the District of Columbia to be:

(1) a common-law marriage may be lawfully contracted in that jurisdiction by a man and a woman legally capable of entering into a marriage relation;

(2) the requisites of its validity are:

a) an express mutual agreement or consent to be husband and wife, and

b) consummation of the agreement by cohabitation as husband and wife;

---

**13.** The court in *Britton,* footnote 4, at 254, referring to *Thomas v. Murphy, supra,* quoted only that part of *Thomas* which said that where cohabitation was at the outset illicit from choice, it is reasonable to require some evidence of a change of intention before finding a marriage. It did not quote what followed: "but where * * * marriage at the outset was impossible, there is no good reason for demanding such a change."

(3) the best evidence of the agreement is the testimony of the parties, but

a) if neither is available as a witness, proof of cohabitation and general reputation as a married couple, may, in some circumstances, be sufficient to warrant an inference of marriage by consent; but

b) when one of the parties, although asserting the existence of a common-law marriage, denies or fails to say there was mutual consent or agreement, mere cohabitation, even though followed by reputation, will not justify an inference of mutual agreement or consent;

(4) when cohabitation is not meretricious at the outset, mere removal of an impediment, real or supposed, to the marriage, with continued cohabitation, results in a common-law marriage;

(5) when cohabitation is meretricious at the outset, as for example, by lack of mutual agreement and consent to be husband and wife, cohabitation and reputation after removal of an impediment, real or supposed, to marriage, will not ripen into a common-law marriage — there must be an express agreement or consent to be husband and wife after the removal of the impediment.

## IV

It is patent that Annie and James expressly consented to enter into a marriage relationship because it is not disputed that they engaged in a formal civil marriage ceremony in New York City on 3 March 1959. Although a marriage between Annie and James was then not possible, she at the time being married to Perry, as she well knew, the cohabitation between Annie and James was not meretricious, there being a mutual expressed agreement to be married. If, therefore, they cohabitated as husband and wife in the District of Columbia after the impediment to the marriage was removed, their relationship would ripen into a

valid common-law marriage. The impediment was removed by Annie's divorce from Perry on 26 February 1970, effective 26 March 1970, in the District of Columbia.[14] The judge presiding at the *de novo* trial below summarized the evidence before him:

"Mrs. Bertha Boone, mother of the alleged surviving spouse, [who lived at 50 Girard Street, Northeast, Washington, D.C.], testified that the decedent and her daughter lived with her after their New York marriage; and, more particularly, from November, 1969 through June of 1970; that they, meaning the decedent and her daughter, used 'my house' as his and/or their home, used 'my house' as his permanent residence, parked his Jaguar with D. C. registration plates in front of the house, and from other exhibits introduced it appears that they filed a joint tax return asserting that they were husband and wife for the years 1969 and 1970, although showing an address of Quarry Street in Capitol Heights, Prince George's County, Maryland. However, there was a declaration that they were husband and wife.

Other evidence introduced, including, inter alia, the Exhibit No. 1 of the caveator, that is Domestic Relations 70-2168, and caveatee's Exhibit No. 1, the letter dated March 4, 1972, indicate that there was a holding out of the marital relationship by both of the parties.

In jurisdictions where formal solemnization is not necessary, a valid marriage may be presumed to have occurred after the impediment was removed. In this case, we don't have to resort to a presumption because there is a preponderance of

---

14. Annie's divorce from Perry is also not disputed. A cross bill and motion for annulment filed by James in the cause brought by Annie in the Circuit Court for Prince George's County, Equity No. DR-70-2168, and as an exhibit in the instant case, avers her divorce from Perry "on 26 February 1970, in the Court of General Sessions for the District of Columbia, in Equity Docket No. 456-69."

the evidence in this case that the mutual consent, the living together, not a single day but on many occasions at the residence of Mrs. Boon actually did occur."

There was legally sufficient evidence to support his factual findings. His judgment on the evidence that Annie and James cohabitated as husband and wife in the District of Columbia after the impediment to their marriage was removed was not clearly erroneous. Maryland Rule 1086. This being so, Annie and James were validly married under the common law, and that marriage not being dissolved by divorce, Annie was the lawful wedded wife of James at the time of his death, and surviving him, was his widow. The holding of the court below was correct.

*Order of 25 June 1973 affirmed; costs to be paid by appellant.*