376 S.E.2d 144

**In the Matter of The ESTATE OF William E. FOSTER, Deceased.**

**No. 17979.**

Supreme Court of Appeals of West Virginia.

Dec. 9, 1988.

---

Hoy G. Shingleton, Rice, Douglas & Shingleton, Martinsburg, for Anna P. Hartle, et al. Admx. of Estate of Foster.

Michael L. Scales, Askin, Pill, Scales & Burke, Martinsburg, for appellee.

BROTHERTON, Justice:

This is an appeal from a final order of the Circuit Court of Berkeley County adopting a Fiduciary Commissioner's ruling that William E. Foster and Lena G. Harris, both now deceased, were married by virtue of their cohabitation in the District of Columbia. The petitioners, Patricia A. Neal

and Harold R. Neal, co-administrators of the Estate of Lena G. Harris, appeal the final order in an attempt to have certain property, which is currently commingled with the Estate of William E. Foster, returned to the Harris Estate.

Lena G. Harris began living with William E. Foster in the District of Columbia in 1953. Harris had been married twice, her second marriage to Walter Harris having ended with his death on August 21, 1951. Harris and Foster lived together in the District of Columbia until approximately 1959, thereafter moving to Arlington, Virginia.[1] Harris died on June 1, 1981, at age seventy-eight. Following her death, Foster took all of their personal belongings and moved to Berkeley County, West Virginia, where he died at age seventy-nine on September 3, 1981.

On February 22, 1982, Harold and Patricia Neal, the co-administrators of the Estate of Lena G. Harris, filed a proof of claim against the Estate of William E. Foster, claiming that personal property and monies with an approximate value of $20,000.00 were commingled with the Foster Estate and rightfully belonged in the Estate of Lena G. Harris. The Harris Estate argued that Harris and Foster never expressed the requisite intention to enter into a common law marriage and that Harris' property should therefore pass to her grandchildren as her heirs at law.[2]

Pursuant to the filing of the proof of claim, hearings were conducted by the Commissioner of Accounts of Berkeley County, West Virginia, on September 17, 1982, October 28, 1982, and August 4, 1983. Evidence and testimony were presented relating to the existence of a common law marriage, ownership of the commingled personal property, and the status of sever-

al joint savings accounts. Following the completion of these hearings, on February 17, 1984, Fiduciary Commissioner Clarence E. Martin made findings of fact and concluded that Lena G. Harris and William E. Foster were legally married. The County Commission of Berkeley County affirmed the Fiduciary Commissioner's decision on June 15, 1984, and the Circuit Court of Berkeley County entered its final order adopting the Fiduciary Commissioner's decision on October 20, 1986. In this final order Judge Patrick G. Henry, III, listed the evidence which supported the Fiduciary Commissioner's conclusion, as follows:

1. That Foster and Harris cohabited for a period of thirty (30) years which originated in the District of Columbia and which jurisdiction recognizes common law marriages.
2. That the parties thereafter moved to Arlington, Virginia, where they continued their living arrangements.
3. That there was at least one bank account in Virginia in the name of Foster and Harris jointly.
4. That Foster paid all of the unpaid bills of Harris after her death including hospital and funeral bills.
5. That the death certificate of Harris was filed in the name of "Foster."
6. That there was little discussion by the parties as to third persons concerning their marital status.
7. That at the time the parties began cohabitation, neither was entering upon a meretricious relationship.

The following factors were characterized as tending to warrant a finding against the existence of a common law marriage:

1. That Lena G. Harris continued to use the name Harris, despite cohabiting.

1. The exact date of Harris and Foster's move to Virginia is not apparent from the record. William P. Sherrard testified that Harris and Foster had lived together in the District of Columbia from 1953 until at least 1958. Lavelle Foster Mundey stated that the couple moved to Virginia about the time of her own husband's death in 1962. Perhaps most conclusive is the fact that a lease for the Arlington, Virginia, home was entered into by William E. Foster for a five-year term beginning on May 1, 1959.

2. Harris had two children during her first marriage to William E. Bean, which ended in divorce. Harris' son, John William Bean, died on September 12, 1980, and her daughter, Ana Louise Alt, died on March 25, 1981. The co-administrator of the Estate of Lena G. Harris, Patricia Neal, is one of Harris' five surviving grandchildren.

2. That the tax returns for Harris for the years 1978, 1979 and 1980 indicate her filing status as single.

3. That Harris received her own social security benefits and not benefits through a spouse.

4. That upon Harris' application for retirement, it was indicated that she was not married.

After reviewing the evidence considered by the Fiduciary Commissioner, Judge Henry determined that there was substantial or conflicting evidence upon which the Commissioner could properly find that Harris and Foster had entered into a common law marriage and, therefore, the Fiduciary Commissioner's findings were not clearly wrong and subject to reversal.

The petitioners now appeal this final order, asserting that there was not a common law marriage between Harris and Foster and that Harris' property rightfully belongs to her estate. We find that there is sufficient evidence to support the lower court's finding of a common law marriage, and thus we hereby affirm the order of the Circuit Court of Berkeley County for the reasons set forth below.

### I.

"A common-law marriage is not recognized as a valid marriage in West Virginia." Syl. pt. 3, *State v. Bragg*, 152 W.Va. 372, 163 S.E.2d 685 (1968). However, the general rule is that the validity of a marriage is determined by the law of the jurisdiction in which it was contracted or celebrated. Syl. pt. 4, *Meade v. State Compensation Commissioner*, 147 W.Va. 72, 125 S.E.2d 771 (1962). Thus, this Court will recognize as valid and will accord legal effect to a common law marriage created or consummated in another state if recognized as valid in that state. *Bragg*, 152 W.Va. at 374–77, 163 S.E.2d at 687–88.

The circumstances of this case require West Virginia courts to apply the District of Columbia's law pertaining to the validity of a common law marriage. Common law marriages have been given judicial recognition in the District of Columbia since *Hoage v. Murch Bros. Const. Co.*, 50 F.2d

983 (D.C.Cir.1931). As we noted above, Harris and Foster began living together in the District of Columbia in 1953. They later moved to Arlington, Virginia, where they resided until Harris' death in 1981. Foster then moved to Berkeley County, West Virginia, and lived there until his death on September 3, 1981.

If the other components of a common law marriage are found to be present, this Court may recognize the existence of such a relationship between Harris and Foster since their relationship was established in Washington, D.C., where common law marriages are valid. Their subsequent residency in Virginia does not negate the marriage. Like West Virginia, the law of Virginia does not recognize common law marriages. *Offield v. Davis*, 100 Va. 250, 40 S.E. 910 (1902). However, Virginia will recognize such relationships if they are consummated in a state where valid between parties who are not forbidden to marry under Virginia law. *Metropolitan Life Ins. Co. v. Holding*, 293 F.Supp. 854 (E.D.Va.1968). Thus, if Harris and Foster had effected a valid marriage under the laws of the District of Columbia, they would continue to be legally married in Virginia.

There are several elements necessary to establish the existence of a common law marriage in the District of Columbia. In *United States Fidelity & Guaranty Co. v. Britton*, 269 F.2d 249 (D.C.Cir.1959), the United States Court of Appeals for the District of Columbia Circuit stated:

> ... whatever the rule may be elsewhere, in the District of Columbia it is that when a man and woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results.

*Id.* at 251. Emphasizing that cohabitation and reputation alone are not sufficient to establish a common law marriage without an express agreement to be husband and wife, the court also stated:

The best evidence of an express agreement is the testimony of the parties. If neither is available as a witness, however, proof of cohabitation and general reputation as a married couple might, in some circumstances, be sufficient to warrant an inference of marriage by consent.

*Id.* at 252 (footnote omitted).

In footnote 9 of *Marcus v. Director, Office of Workers' Compensation Programs, U.S.. Department of Labor,* 548 F.2d 1044, 1048 (D.C.Cir.1976), the United States Court of Appeals for the District of Columbia discussed the fact that "[t]he legal prerequisites of a valid common law marriage, while easily stated, are 'almost uniformly misunderstood ... [S]uch a marriage requires more than mere cohabitation coupled with adoption of the "husband's" surname.' " *McCoy v. District of Columbia,* 256 A.2d 908, 910 (1969). Noting that the mutual express agreement between the parties is "particularly elusive and difficult of direct proof," the *Marcus* court stated:

The existence of an agreement may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship.

548 F.2d at 1048 n. 9 (citations omitted).

In the final order now before us, Judge Henry noted the Fiduciary Commissioner's difficulty in evaluating the evidence presented at the hearings. This understandable difficulty was due primarily to "the fact that the efforts to establish or disprove the existence of a common law marriage occurred after the death of both of the claimed parties to the marriage. As such, substantial evidentiary matters are lost for the consideration of the Commissioner." Because neither Harris nor Foster could testify as to whether they intended to be married and to have the world perceive them as a married couple, the Fiduciary Commissioner was left to consider the cohabitation and reputation evidence presented by the witnesses for the respective estates at the hearings, as well as some documentary evidence. Given these circumstances, we believe the exception discussed in *United States Fidelity & Guaranty Co.* must apply and thus proof of cohabitation and general reputation as a married couple may be sufficient to warrant a finding of marriage by consent in this case. 269 F.2d at 252.

In affirming the Fiduciary Commissioner's finding of a common law marriage, Judge Henry stated that "The cohabitation which may give rise to a claim of a common law marriage is generally not considered in terms of decades as in the case before the court." He then noted that nearly thirty years of continued cohabitation is a "strong indication, per se, of the permanent relationship between Harris and Foster." This unique aspect of the Harris–Foster relationship obviously persuaded the lower court to find that the cohabitation requirement was satisfied.

Although cohabitation evidence is substantial and convincing, evidence of the parties' reputation as a married couple is somewhat contradictory. The hearing testimony regarding reputation consisted of either uncertainty about the relationship or assumptions that Harris and Foster were married based on the length of their relationship and their behavior towards one another.[3] It is apparent that none of the

---

3. For example, Anna E. Hartle, Harris' niece and a co-administratrix of Foster's estate, repeatedly stated that she "did not know whether he [Foster] was married or whether he wasn't." Lavelle Foster Mundey, Foster's sister, said she "thought ... [Harris] was my sister-in-law."

William P. Sherrard, Harris' nephew, concluded that Harris and Foster were married because they shared a bedroom and he never saw them apart. He added that his conclusion was reinforced by the fact that his mother would not let people sleep together in her house if they were not married. William Sherrard also stated that he had "never even heard ... [the subject of the relationship, i.e., whether they were married] brought up in a conversation."

William Sherrard's wife, Betty Marie Baker Sherrard, said she believed that Harris and Foster were married because of things Foster did around the house. She also noted that all of the nephews and nieces in the family referred to Foster as "Uncle Bill" but admitted that no one had ever told her that Foster and Harris were husband and wife.

witnesses who testified before the Fiduciary Commissioner had ever asked Harris or Foster whether they were married, quite possibly because it was never an issue within the family.

In his final order Judge Henry concluded that "[w]hile there is no clear indication of a public affirmation of a marital status, neither is there an indication of a denial of a marriage relationship." Although Harris and Foster were not secretive about their cohabitation or their sleeping arrangements, they were obviously private individuals who did not feel compelled to enlighten those around them as to the legal status of their relationship, especially in light of the family's apparent recognition of the relationship as a permanent one.

## II.

While we may draw an inference from circumstantial evidence that Harris and Foster regarded themselves as married, that inference may be rebutted by direct evidence that there was no agreement to be married. *United States Fidelity & Guaranty Co.*, 269 F.2d at 252.[4] Thus, we must next examine the petitioners' contention that there is evidence which conclusively shows that Harris denied having a marital relationship with Foster.

At the hearings before the Fiduciary Commissioner the petitioners introduced copies of Harris' federal income tax returns for the years 1978, 1979, and 1980, on which Harris indicated her filing status was "single," as well as a civil service retirement application completed by Harris in 1963, on which Harris responded to the question "Are you married?" by marking the "No" box.[5] Additionally, petitioners point out that Harris received her own social security benefits rather than benefits through a husband and that she always used the name "Harris," never "Foster."

All of this evidence was previously considered by Fiduciary Commissioner Martin and Judge Henry, both of whom concluded that the greater weight of the evidence warranted a finding of a common law marriage.

In his findings of fact Commissioner Martin stated that Harris' use of the name "Harris" "could have been a fetish with her rather than a distinct statement of their legal relationship about which she would not have been legally informed." We do not believe that the Commissioner was merely speculating on this point, as the petitioners suggest. It is not difficult to imagine that a person who considers herself married without having the benefit of a formal ceremony or even a marriage license would be uncertain about how to respond to government inquiries as to her marital status. Furthermore, Lena G. Harris' use of the name "Harris" is not conclusive evidence of a denial of a marital relationship. We would not suggest that a woman who chooses not to use her husband's last name is any less married than a woman who does. Nor do we find the fact that Harris received her own social security benefits helpful in ascertaining whether there was a common law marriage between Harris and Foster.

While this evidence, standing alone, might be enough to persuade a court that

---

Pamela Sherrard, Harris' great-niece and a co-administratrix of Foster's estate, first began visiting the couple in their Arlington, Virginia, home when she was six years old. She testified that Foster and Harris had lived together "ever since I can remember" and that they appeared to her to be husband and wife. Pamela Sherrard noted their use of the words "we" and "our" in conversation and stated that "everyone regarded them as married." On cross-examination, however, she conceded that "nobody really knew for sure if they were or if they weren't married."

**4.** *See also, Caldwell v. Caldwell,* 140 A.2d 926 (D.C.App.1958), where the court stated that a presumption of marriage raised by the parties' cohabitation and reputation "may be completely refuted by evidence that the parties never intended to enter into such a relationship." *Id.* at 927.

**5.** It should be noted as well that on this same retirement application Harris signed her initials in a box in the section of the application labeled "F. Types of Annuity: Married Applicants Only," indicating that she wanted an annuity without a survivor benefit. The next section of the application is clearly labeled "G. Types of Annuity: Unmarried Applicants Only (Including Widowed and Divorced)."

these parties had no intention of being married, we do not reach that conclusion in this case. Instead, we believe that other evidence suggests even more strongly that there was a relationship between Harris and Foster that was worthy of recognition as a common law marriage by a District of Columbia court. We have already discussed the evidence of cohabitation and reputation from which we believe a marriage by consent can be inferred. In addition to almost thirty years of continually living in the same home and sharing the same bedroom, Harris and Foster maintained several joint bank accounts. In the bank book to at least one of these accounts it was clearly stated that the account was "to be theirs as joint owners, subject to order of either, and balance at death of either to the survivor." Thus, Foster was entitled to receive these monies when Harris died.

Numerous receipts put into evidence at the hearings indicate that Foster made many major household purchases through the years. A lease for the Arlington, Virginia, home was in his name and his name also appeared on money orders which were used to pay the monthly rent. Upon Harris' death Foster paid her funeral expenses and her unpaid bills with monies from their joint account.

More persuasive to this Court, however, is evidence of Foster's perception of his relationship with Harris at the time of her death, three months before he himself died of cancer. On both the funeral bills and the death certificate Harris is identified as "Lena G. Harris Foster." On the death certificate, in response to a question asking for the source of the information contained on the certificate, it states "William E. Foster—Husband." While the petitioners speculate that this is evidence of nothing more than Foster's own self-interest, we

disagree. Instead, we believe it is evidence of Foster's belief that Lena G. Harris Foster was his wife.

### III.

As the petitioner in this proceeding, the Estate of Lena G. Harris bears the burden of proving that there was not a common law marriage between Harris and Foster.[6] We do not find that they have met this burden.

■ Fiduciary Commissioner Martin heard the testimony of the witnesses at the hearings below and evaluated the evidence which was presented by both parties. His finding of a common law marriage was based upon consideration of both the evidence and the District of Columbia's requirements for a common law marriage. Similarly, Circuit Court Judge Henry, in his final order affirming the Fiduciary Commissioner's findings, reviewed the evidence considered by the Commissioner and the significance attached to it. "The findings of a commissioner in chancery, on questions of fact, should generally be sustained unless not warranted by any reasonable view of the evidence and such findings are entitled to peculiar weight in an appellate court when they have been confirmed by the decree from which an appeal has been granted." Syllabus point 1, *Baker v. Hamilton*, 144 W.Va. 575, 109 S.E.2d 27 (1959).

■ As we noted earlier in this opinion, West Virginia does not give legal recognition to common law marriages entered into in this state. However, when asked to determine whether a common law marriage has been established in a state which recognizes the validity of the relationship, this Court will diligently apply that state's law to the facts while considering the unique circumstances present in any given case. Having found that the weight of the evi-

---

**6.** In *East v. East*, 536 A.2d 1103 (D.C.App.1988), the District of Columbia Court of Appeals discussed the proof necessary to establish the existence of a common law marriage. The court stated:

... our law does not prescribe any particular standard of proof on the issue of whether a common-law marriage exists. We have found no case in the District of Columbia in which the existence *vel non* of a common-law marriage has been subjected to a burden of proof greater than that required in any other civil case. Thus we hold that a party alleging a common-law marriage need prove it only by a preponderance of the evidence.

*Id.* at 1105–06.

dence supports the finding of a common law marriage between Harris and Foster, and that the lower court's decision was based upon a correct analysis of the applicable law, we hereby affirm the decision of the Circuit Court of Berkeley County.

AFFIRMED.